873 So.2d 923 (2004)
Timolin JOHNSON, Plaintiff-Appellee
v.
JOHNSON CONTROLS, INC., Defendant-Appellant.
No. 38,495-WCA.
Court of Appeal of Louisiana, Second Circuit.
May 12, 2004.
Rehearing Denied June 17, 2004.
*926 Onebane Law Firm by Frank H. Spruiell, Jr., Shreveport, for Appellant.
Caldwell & Caldwell by James D. Caldwell, Tallulah, for Appellee.
Before CARAWAY, PEATROSS and LOLLEY, JJ.
LOLLEY, Judge.
After claimant Timolin Johnson ("Johnson") developed symptoms of carpal tunnel syndrome ("CTS"), she requested compensation benefits and medical treatment from her employer, Johnson Controls, Inc. ("Johnson Controls"), but was refused. She filed a disputed claim for compensation, and after a trial, the Office of Workers' Compensation ("OWC"), Judge Glynn Voisin, District 1W[1], awarded her weekly benefits, medical expenses, penalties and attorney fees. Johnson Controls now appeals. Johnson has answered the appeal seeking an increase in the award of attorney fees. For the following reasons, we affirm in part, reverse in part and deny an increase in attorney fees.

FACTS
Johnson Controls operates a factory in Shreveport where it assembles truck seats for General Motors. On November 16, 1999, the claimant, who was 34 years old at the time, commenced employment with Johnson Controls, and after a two-week orientation and training period, she began working on the assembly line. In that capacity, Johnson performed various jobs that required the repetitive and strenuous use of her hands over the course of her eight-hour shift. At trial, she testified that after she commenced work for Johnson Controls, she began to have pain in her hands and numbness at night. She said that she had previously worked on an assembly line but had never held employment where she had to do repetitive work like she did at Johnson Controls. She also said that she had never previously been treated for hand or wrist pain and there is no medical evidence in the record to suggest that she had any similar pain prior to working for Johnson Controls. Her husband, Lionel, confirmed that her complaints of pain commenced only after she went to work for Johnson Controls.
Johnson first complained to a Johnson Controls employee, Elaine Mack, of wrist and hand pain on or about February 29, 2000. Johnson's medical records reflect that she first complained to a doctor, Dr. Wendy McBride Moses, on April 24, 2000, that she had "pain in her hands and numbness at night" and that she "has had these symptoms for the past six months." Johnson did not deny telling Dr. Moses that she had been having pain for six months but said that she had no complaints of pain prior to working on the assembly line. The doctor's report indicates that Johnson "works at the plant at General Motors and repeatedly is pulling down air guns for the past year." Johnson denied saying this to *927 the doctor. The doctor diagnosed her with "musculoskeletal pain of bilateral wrists and left scapula" and prescribed an anti-inflammatory medication.
Over the summer, Johnson continued to work but testified that she was working in pain. Johnson returned to see Dr. Moses on September 27, 2000, with continued complaints of pain in her hands "for the past year." Johnson denied saying that the pain had been ongoing for a year. At the trial, she consistently attributed her pain as secondary to her work at Johnson Controls. The doctor again diagnosed Johnson with musculoskeletal pain and prescribed a muscle relaxant and another anti-inflammatory medication. On a November 2000 visit, Johnson complained of a cyst on one hand, for which Dr. Moses referred her to an orthopedic surgeon, Dr. John Knight.
Dr. Knight examined Johnson on November 16, 2000. His report reflects that Johnson gave him "a six month history of numbness, tingling and pain in both hands." Dr. Knight performed two types of tests on Johnson to determine if she had CTS. The doctor performed "NPT" or neuropsychological tests on her and reported "negative at the median nerve at both wrists" and "negative at the ulnar nerve at both elbows." He also performed a "Phalen's" test that also gave negative results. Dr. Knight's impression of Johnson's condition was "cumulative trauma disorder both hands secondary to work at Johnson Controls." Dr. Knight's records also noted that the cyst on Johnson's hand was "most likely secondary to this patient's work." Dr. Knight ordered electrodiagnostic testing of Johnson's wrists and told her to take frequent breaks and rest her hands at work. He also directed that if the symptoms continued, she may need permanent restrictions. Johnson Controls did not receive this report from Dr. Knight and did not know that Johnson had seen him.
On November 29, 2000, Dr. Benjamin Nguyen performed electrodiagnostic tests on Johnson, and his report stated:
Findings are consistent with mild bilateral median sensory neuropathy across the wrist (carpal tunnel syndrome) with no evidence of denervation of the thenar muscle (sic) was seen bilaterally.
Again, there is no indication that Johnson Controls received a copy of this report.
On December 22, 2000, Johnson went to see Dr. James Dossey, an occupational medicine specialist. Johnson gave Dr. Dossey a history of numbness and tingling in her right hand that had developed over the last month. Dr. Dossey performed two tests on Johnson's wrists, a Tinel's test and a Phalen's test, to determine if she had CTS. Dr. Dossey stated that Johnson only had complaints of numbness with the Phalen's test and that this numbness did not extend out into the hand or up the arm on the right. Dr. Dossey further explained that this would not be considered a positive test for CTS. He admitted, however, that the tests are not completely explained that this would not be considered specific and sensitive. The doctor reviewed Dr. Nguyen's electrodiagnostic tests and observed that the findings were on the outer limit of normal. Dr. Dossey said that he would defer to a neurologist in interpreting these tests, but said that he would dispute a diagnosis of CTS made solely on the basis of neurological testing. He attributed her pain to soreness and gave her splints to wear. Johnson saw Dr. Dossey again on January 11, 2001, and Johnson reported some improvement with only occasional shooting pain on the back of her right hand and no further numbness or pain in the arm. The doctor opined that this shooting pain was not a finding associated with CTS. His report from that date reflects:

*928 Arm pain, I doubt there is any carpal tunnel syndrome or other nerve entrapment. In fact, she is having minimal symptoms and normal exam; however, because of her body stature, I think she needs to strengthen her arms in order to tolerate the work that she has chosen.
In his subsequent, January 23, 2001, report, Dr. Dossey stated:
She does not appear to have a work related disease or injury. She simply has arm pain. She feels like it is due to straining in some parts of her job. I still am of the belief that she would benefit from a conditioning exercise program if she chooses to continue with this occupation.
Johnson was off work beginning in early January for 30 days for a reason unrelated to her medical condition. Notably, on subsequent visits with physicians, she made no complaints of hand or wrist pain.
In early May 2001, Johnson saw the physical therapist at work with complaints of pain in her hands. The employer sent Johnson to see Dr. Donald DeLoach, a general surgeon who practiced in the area of emergency medicine. Dr. DeLoach said that during his career he had worked for a year in occupational medicine and had treated "probably not over half a dozen" patients for "true" CTS during that year.
Dr. DeLoach's report indicated that Johnson had negative Tinel's tests on both hands but had "a little pain in the right thenar area when the median nerve area is tapped." The doctor recommended that Johnson take ibuprofen and undergo additional lab work, which Johnson failed to do. The doctor's report indicated that his diagnosis of Johnson was "bilateral hand and wrist pain of nonspecific origin, not necessarily work related," and he did not restrict Johnson's work activities. Johnson Controls relied on his report in handling Johnson's case.
On May 11, 2001, Johnson saw Dr. Knight again. That day, Dr. Knight gave Johnson a letter addressed "to whom it may concern" stating that Johnson had CTS and that it was his opinion that her condition was work-related. Dr. Knight also gave her a letter excusing her from work from May 11, 2001, until May 14, 2001. The May 11, 2001, report from Dr. Knight was the first report the employer received from Dr. Knight. Until this time, Johnson had not missed any time from work due to hand or wrist pain. Johnson returned to work on May 14th but was told that there was no work for her, and she was off work the next week. Dr. Knight was not deposed for this case, nor did he testify at trial.
On May 14, 2001, Johnson filed a report of injury, LDOL 1007, stating that the repetitive use of her hands and wrists had resulted in strains. On May 21, 2001, Johnson returned to work under a new schedule giving her frequent 15-minute breaks during which she was supposed to do odd jobs around the plant but refrain from regular work. However, Dr. Knight wanted her to take one 15-minute break each hour with no use of her hands during the break, and on May 29, 2001, he wrote her a note to that effect. Johnson took the note to her supervisor and learned that Johnson Controls had no work for her under those restrictions, so she went home. On May 31, 2001, Dr. Knight wrote Johnson another note excusing her from work "indefinitely" from that day forward, which recommendation Johnson Controls was aware.
Dr. Knight closed his practice on June 30, 2001, and transferred Johnson's care to another doctor, Dr. Paul Davis. Prior to seeing Dr. Davis, Johnson had a hysterectomy on July 9, 2001. Although she was not working for Johnson Controls during *929 this time, the surgery would have prevented her from working until she was released to full activity on August 24, 2001. Johnson Controls was not aware of this surgery or recuperation period.
On July 20, 2001, Johnson saw Dr. Davis for her complaints of hand and wrist pain. His report from that date indicates that Johnson had been wearing splints at night and that she reported her symptoms had improved significantly over the last couple of months. The report diagnosed Johnson with "mild" CTS with resolving symptoms. Dr. Davis wrote in the report that:
I feel that the patient can make an attempt to try to go back to work, but I have cautioned her that she should be careful about trying to take occasional breaks and try to break up the repetitive nature of her work and try to avoid certain motions that I have shown her that may aggravate her CT. I have also instructed her to continue wearing her splints when she is not at work.
However, Johnson did not attempt to return to work; she testified that this was "because I wasn't released." She explained that the doctor did not give her any kind of a note releasing her to work, nor did he communicate to her that he had released her to work. At trial, she said that the doctor did not do a Phalen's test or a Tinel's test, that she did not tell Dr. Davis that her condition had significantly improved and that the doctor's statement that she could make an attempt to go back to work was a "lie."
On August 1, 2001, the Johnson Controls human resources manager, Ms. Karen McDonald, sent Johnson a letter stating that the employer had received Dr. Davis' July 20, 2001, report releasing her to return to work. The letter informed Johnson that the employer, pursuant to the employee handbook, now considered that Johnson had resigned from her job since she had not appeared at work for three consecutive working days and had offered no explanation. The company also noted that her benefits had been terminated.
Johnson continued to have pain in her hands and wrists so on August 17, 2001, she saw Dr. Sigurd Sandzen, an orthopedic hand surgeon. The history section of the doctor's report states that Johnson said that her pain commenced on or about September 11, 2000; Johnson denied that this was accurate. Dr. Sandzen's examination of Johnson revealed a positive Tinel's test for CTS, and a Phalen's test produced "slight hypesthesia and dysesthesia" in some of the fingers on Johnson's right and left hands. Dr. Sandzen recommended that Johnson return to "whatever job activity she can tolerate" with 10 to 15 minutes off each hour and without repetitive motions, or, if she was unable to return to work with those conditions, to obtain a permanent partial impairment rating. She returned to see Dr. Sandzen on August 28, 2001, with her condition "essentially unchanged"; the doctor gave her a steroid injection in the right wrist and prescribed medication. On September 7, 2001, Johnson returned to the doctor with "distinct improvement" after the injection; the report from this date says that "surgery is not considered at this time, particularly since she is improving...." Johnson did not thereafter return to see Dr. Sandzen, stating she could not afford to return. The trial in this matter commenced.[2] The *930 judgment awarded Johnson weekly benefits of $293.33 per week commencing May 10, 2001, with a suspension from July 9, 2001, through August 24, 2001, and further awarded Johnson medical expenses of $668.00. In addition, the OWC imposed penalties on Johnson Controls in the amount of $2,000.00 for unpaid benefits, $2,000.00 for unpaid medical expenses and $2,000.00 for failure to authorize medical treatment. Finally, the OWC awarded Johnson $10,000.00 in attorney fees. From this judgment, Johnson Controls now appeals, which appeal Johnson answered.

DISCUSSION

Standard of Appeal
Generally, whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the judge. Harris v. Coushatta Indus. Sand, Inc., 31,977 (La.App.2d Cir.06/16/99), 741 So.2d 143. Factual findings in worker's compensation cases are subject to the manifest error rule. Hoy v. Gilbert, 98-1565 (La.03/02/99), 754 So.2d 207; Harris, supra. Under the manifest error rule, the reviewing court does not decide whether the factual findings are right or wrong, but whether they are reasonable. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Graham v. Georgia-Pacific Corp., 26,165 (La. App.2d Cir.09/23/94), 643 So.2d 352. The manifest error/clearly wrong standard of appellate review applies in compensation actions even when the trial court's decision is based solely upon written reports, records or depositions. Bruno v. Harbert Intern., Inc., 593 So.2d 357 (La.1992); Harris v. Casino Magic, 38,137 (La.App.2d Cir.01/28/04), 865 So.2d 301.
Here, as explained, the OWC judge who presided over the trial was not the same OWC judge who ultimately rendered the final judgment. For that reason Johnson Controls argues that the normal rule of manifest error ought not to be given its usual weight in reviewing the trial judge's conclusion of fact.
Initially, we note that La. C.C.P. art.1911 provides for every final judgment to be signed by "the judge" except as otherwise provided by law. This article, which applies to workers' compensation cases as well as ordinary civil actions, means that a judgment is invalid unless it is signed by the judge who heard the trial of the case. Under these circumstances, La. R.S. 13:4209 A applies, which states:
A. In all cases heard and taken under advisement of the district judge or judges of the city courts, if the judge before whom a case is tried dies, resigns, or is removed from office, or if his term expires before rendering his judgment in the case, his successor in office shall decide the case from the evidence in the record, if all of the testimony is in writing. If it is a case in which the testimony has not been reduced to writing, the succeeding judge shall decide the case from a statement of the facts, if one is found in the record, or if the parties to the suit agree upon a statement *931 of facts. If the testimony is not in the record, and there is no statement of facts, the case shall be tried de novo.
This statute is considered applicable to judges in workers' compensation proceedings, as well. See Andrus v. Crowley Laundry & Dry Cleaners, 2003-571 (La. App. 3rd Cir.11/05/03), 858 So.2d 802. On this record, we find no defect in the judgment or the OWC's jurisdiction in this matter.
However, when the trial judge does not see and hear the witnesses, his conclusions of fact cannot carry the usual weight of the general manifest error rule. See Allstate Ins. Co. v. Shemwell, 142 So.2d 866 (La.App. 2nd Cir.1962); Smith v. West Calcasieu-Cameron Hosp., 251 So.2d 810 (La.App. 3rd Cir.1971); Terrell v. American Auto. Ins. Co., 125 So.2d 189 (La.App. 3rd Cir.1960); Boudreaux v. Moreau, 73 So.2d 192 (La.App.Orleans 1954). Aware of these authorities, this court may assign less weight than usual to the OWC's finding of fact concerning the credibility of those witnesses which testified at the trial of the matter. See, Smith, supra. Thus, technically, Johnson Controls is correct as to that issue. However, we note that in this case, the medical evidence, which was relied upon heavily by the OWC, was not presented as live testimony but through depositions and medical reports. Therefore, the original OWC judge had no greater ability to evaluate the witnesses and evidence than the OWC that ultimately considered it and rendered the final judgment; therefore, the assessment of those witnesses and evidence will be given the normal weight in our review of this matter.[3]

Johnson's Disability
Johnson Controls also argues on appeal that Johnson does not have CTS, and that the OWC's findings to that effect supporting its award of benefits were in error. We disagree.
Generally, an injured employee is entitled to receive benefits for an injury that arises out of and in the course of his employment. La. R.S. 23:1031. Specifically, La. R.S. 23:1031.1 governs workers' compensation claims for occupational disease such as CTS. La. R.S. 23:1031.1 provides, in part:
D. Any occupational disease contracted by an employee while performing work for a particular employer in which he has been engaged for less than twelve months shall be presumed not to have been contracted in the course of and arising out of such employment, provided, however, that any such occupational disease so contracted within the twelve months' limitation as set out herein shall become compensable when the occupational disease shall have been proved to have been contracted during the course of the prior twelve months' employment by a preponderance of evidence.[4]
In other words, where an employee worked for an employer for less than twelve months, there is a rebuttable statutory presumption that her employment did not cause her occupational disease. However, that presumption can be overcome if she proves by a preponderance of the evidence that the disease was contracted during her employment, specifically proving *932 that there is a disability which is related to an employment-related disease, the disease was contracted during the course of employment, and the disease is a result of the work performed. Ball v. Wendy's Intern. Inc., 36,922 (La.App.2d Cir.03/05/03), 839 So.2d 1208, writ denied, XXXX-XXXX (La.05/30/03), 845 So.2d 1056. In making such a determination, it is proper for the OWC to consider medical reports admitted into evidence or expert testimony in finding that a claimant has an occupational disease. File v. Louisiana Title Company, 2002-2607 (La.06/27/03), 852 So.2d 983.
Initially, we note that the trial court erred in failing to apply the presumption stated in La. R.S. 23:1031.1(D) in favor of Johnson Controls. Here, Johnson was diagnosed with CTS exactly a year after her employment with Johnson Controls commenced. However, as the record clearly shows, Johnson's symptoms manifested well within the initial twelve month period of her employment, which would trigger the statutory presumption in favor of Johnson Controls. See Jackson v. Conagra Poultry Co., 02-492 (La.App. 3rd Cir.03/05/03), 839 So.2d 1079, writ denied XXXX-XXXX (La.05/30/03), 845 So.2d 1054; Davies, supra. With this presumption in place, it was incumbent on Johnson to prove by a preponderance of the evidence that her CTS was contracted during her employment. Despite its failure to apply the statutory presumption in favor of the employer, the OWC still concluded that Johnson had CTS and that it was caused by her employment at Johnson Controls. Even though it erred in failing to consider the presumption in favor of Johnson Controls, we cannot say that the OWC's final determination on this particular issue was in error.
First, based on the medical evidence, we find no manifest error in the OWC's conclusion that Johnson suffers from CTS, as most of the physicians who examined her characterized her condition as CTS. Both Dr. Knight and Dr. Nguyen found symptoms of carpal tunnel in their various examinations of Johnson. Dr. Nguyen characterized Johnson's condition as mild based upon objective electrodiagnostic testing. Dr. Knight did not opine about the severity of the condition, although his diagnosis ultimately led him to restrict Johnson from working indefinitely. Dr. Davis also described Johnson's condition as mild carpal tunnel with resolving symptoms, and Dr. Sandzen found some evidence of CTS as well.
Although Drs. Dossey and DeLoach opined that Johnson's condition was not CTS, the factfinder's findings in favor of Johnson on this issue are reasonable in light of the record reviewed in its entirety; moreover, as discussed, such a credibility determination is within the factfinder's realm. The factfinder is not precluded from making determinations regarding the credibility of witnesses and respect should be given to those conclusions. Mosley v. Pennzoil Quaker State, 37,199 (La.App.2d Cir.07/23/03), 850 So.2d 1100, writ denied, 2003-2412 (La.11/21/03), 860 So.2d 553. Here, in its written reasons for judgment, the OWC judge gave detailed reasons for discounting the medical opinions of Drs. Dossey and DeLoach. Such a determination was within the OWC judge's reasonable discretion and was not in error.
Next, we find no error in the OWC's conclusion that Johnson carried her burden of proving that her employment caused her condition. Notably, although Johnson's symptoms did manifest early in her employment, she was not disabled and taken off work until approximately 19 months later. Johnson testified that she suffered no similar pains prior to commencing work on the assembly line and that she had never been treated for *933 similar pain prior to employment with Johnson Controls. Her husband corroborated this testimony. Significantly, Johnson was only 34 years old when she began work at Johnson Controls, but most significantly, there was no medical evidence to show that Johnson had complaints of similar pain prior to her employment at Johnson Controls. In fact, Dr. Dossey stated that he could not say that Johnson's condition pre-dated her employment with Johnson Controls. The employer argues that the histories given by Johnson to Dr. Moses and Dr. Knight show that her condition predates her work on the assembly line. Although the histories are somewhat inconsistent, such is not sufficient to conclude that the OWC was manifestly erroneous in finding a causal link between assembly line work and injury. A worker is not required to relate her history to a doctor with mathematical precision and the imprecise histories given are insufficient to show manifest error when the overall tenor of Johnson's complaints of pain as portrayed in her medical records related the onset of symptoms to her work. Because there is no medical evidence showing complaints of similar pain prior to Johnson's work for Johnson Controls (whereas, on the other hand, there existed medical evidence connecting her condition to her employment with Johnson Controls), we will not disturb the OWC's findings. On the record as a whole, we find no error in the award of indemnity benefits to Johnson.

Medical Bills
Additionally, Johnson Controls argues that it should not be responsible for Johnson's unpaid medical bills of $668.00[5] because it never received written notice of these bills. Johnson counters that no requirement exists for written demand and also that her employer knew Johnson had seen these doctors and had access, by law, to her records and bills. The record reveals no evidence that the claimant gave the employer written notice of the bills; even the claimant's disputed claim for compensation only stated "no medical treatment has been authorized." La. R.S. 23:1201(E) provides that, "Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof." However, this section is part of a penalty statute, and the 60-day provision is a trigger for penalties, not to the employer's ultimate liability for medical expenses. Therefore, we find no error in the OWC's award for the amount of the unpaid medical bills as part of its judgment, even without written demand for payment.

Penalties and Attorney Fees
Finally, Johnson Controls maintains that the OWC erred in assessing it with penalties and attorney fees, and we agree. The determination of whether an employer should be cast with penalties and attorney fees is a question of fact for the OWC judge, whose findings shall not be disturbed on appeal absent manifest error. Taylor v. Garrett, 28,729 (La.App.2d Cir.10/30/96), 682 So.2d 831. In this instance, such an error occurred.
In the case sub judice, Johnson alleges that her employer failed to pay benefits, which would be governed by La. R.S. 23:1201(F). Pursuant to that statute, an employee has the burden of proving his entitlement to statutory penalties for the employer's failure to timely pay workers' compensation benefits. Bolton v. Mike Fleming Constr., 36,521 (La.App.2d Cir.12/11/02), 833 So.2d 1177. To reasonably *934 controvert a workers' compensation claim so as to avoid imposition of penalties and attorney fees, the employer and its insurer must provide sufficient factual and medical information to reasonably counter the evidence provided by the claimant. Id. To meet this standard, the employer must have some "valid reason or evidence upon which to base his denial of benefits." Feild v. General Motors Corp., 36,339 (La. App.2d Cir.09/18/02), 828 So.2d 150. The court must determine whether the employer "engaged in a non-frivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed." Feild, supra. Penalties are stricti juris and should be imposed only when the facts clearly negate good faith and just cause in connection with the refusal to pay. Bolton, supra.
Here, Johnson Controls had the opinion of at least two physicians, Drs. Dossey and DeLoach, who found no evidence of CTS after examining Johnson. Further, the employer had no detailed reports from either Dr. Knight or Dr. Nguyen and was clearly not frivolous in relying only on those reports it had, particularly in the face of incomplete or no information from Johnson's other physicians. There is no showing that the employer dealt with Johnson in less than good faith, so the OWC was manifestly erroneous in awarding penalties and attorney fees. Moreover, for that reason, Johnson's demand on appeal for additional attorney fees is denied.

CONCLUSION
The judgment of the Office of Workers Compensation is affirmed in its award of indemnity benefits and medical expenses but is reversed with respect to the three $2,000.00 penalties and the $10,000.00 attorney fee award. Costs of this appeal are assessed equally to Timolin Johnson and Johnson Controls, Inc.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.

APPLICATION FOR REHEARING
Before STEWART, GASKINS,
CARAWAY, PEATROSS, and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] See La. R.S. 23:1310.5(F).
[2] This matter was tried before Judge Rosa Whitlock. The OWC took the matter under advisement, but Judge Whitlock left the OWC prior to rendering a judgment. Written reasons for judgment included in this record reveal the following procedure for assignment of this case to a new judge:

Trial on the merits was held on November 1, 2002, before Judge Rosa C. Whitlock. On April 10, 2003, Chief Judge Sheral Kellar sent the file to Judge Pamela-Moses Laramore to render judgment. Later, on June 18, 2003, Judge Sheral Kellar sent the file to Judge Glynn F. Voisin to render judgment. On June 18, 2003, Judge Voisin held a telephone status conference with all parties to confirm all parties agreed to allow Judge Voisin to render judgment. All parties agreed, and Judge Voisin allowed the parties (5) five days to submit post-trial briefs. Judge Voisin rendered judgment on July 23, 2003.
[3] Notably, in this case the OWC judge gave extremely thorough and thoughtful written reasons for judgment.
[4] Acts 2001, No. 1189, § 1, at the end of subsec. D, substituted "a preponderance" for "an overwhelming preponderance"; the amendment applies retroactively. Davies v. Johnson Controls, Inc., 36,498 (La.App.2d Cir.10/23/02), 830 So.2d 462, writ denied, 2002-2855 (La.01/31/03), 836 So.2d 70.
[5] $166.00 to the Louisiana Hand and Upper Extremity Institute (Dr. Knight); $90.00 to Dr. Davis and $412.00 to Mid-South Orthopaedics (Dr. Sandzen).