892 So.2d 717 (2005)
James PETERS, Plaintiff-Appellee
v.
GENERAL MOTORS CORPORATION, Defendant-Appellant.
No. 39,279-WCA.
Court of Appeal of Louisiana, Second Circuit.
January 26, 2005.
*718 Lunn, Irion, Salley, Carlisle & Gardner, by J. Martin Lattier, Shreveport, for Appellant.
*719 William T. Allison, Shreveport, for Appellee.
Before BROWN, GASKINS, and CARAWAY, JJ.
BROWN, C.J.
Defendant, General Motors Corporation ("GM"), has appealed a judgment of the Office of Workers' Compensation ("OWC") denying its motion to modify a previous award of benefits to claimant, James Peters. We affirm.

Facts
James Peters began his employment with GM on October 25, 1976, and worked continuously on the assembly line until his retirement on August 1, 2003, at age 63. This appeal concerns Peters' entitlement to supplemental earnings benefits ("SEB").
In 2000, Peters developed carpal tunnel syndrome in both hands and, despite surgery on his right wrist in 2001, Peters became disabled from work in February 2002. Peters filed a disputed claim for compensation with the OWC on May 6, 2002, and in July 2002, GM voluntarily began payment of indemnity benefits to Peters. The record does not show whether these payments were categorized as temporary total disability ("TTD") benefits or SEB. In January 2003, GM scheduled Peters for a medical examination by the plant doctor, Charles Black. Because Peters did not attend this scheduled appointment with Dr. Black, GM ceased paying indemnity benefits to claimant.
On May 9, 2003, this matter was tried. The Workers' Compensation Judge ("WCJ") noted that it had observed the witnesses carefully and that "a lot of this has to go to the issue of credibility." After observing that the termination of Peters' benefits was "totally unnecessary," that the situation "could have been cleared up with a phone call," and that "I don't think General Motors covered itself with glory on this one," the WCJ reinstated Peters' indemnity benefits and awarded him the amount of the missed payments, together with penalties and attorney fees. The WCJ thereafter deleted the penalty award because it was not provided for in the applicable statute.
Six weeks later, on June 23, 2003, GM filed a motion under La. R.S. 23:1310.8 to modify the May 9, 2003, judgment. According to GM, it offered Peters a full-time job at the plant at his old rate of pay, a position that accommodated his medical restrictions. Thus, GM asserted in its motion to modify, it was entitled to terminate Peters' indemnity benefits.
On August 1, 2003, Peters retired from GM. Claimant took a regular retirement rather than a disability retirement. According to Peters:
I didn't know anything about [a disability retirement]. Well, my  the only reason why I retired is to get some relief until I can get my hands together to where I can go and do a job. That's why I had to do something.
He further explained:
Q: Now, was it your intention when you took this retirement to permanently withdraw from the work force?
A: No, no.
Q: What is your intention?
A: Well, as soon as I'm able medically to go to work.
Peters testified, however, that he has not applied for work anywhere else since leaving GM.
The WCJ did not hold a trial on GM's motion to modify the judgment, but decided the matter on the record. On March 26, 2004, the WCJ issued written reasons *720 for judgment in favor of the claimant. In these reasons, the WCJ observed:
A careful reading, or even a cursory reading for that matter, of Dr. Black's testimony simply does not support GM's position [on the relationship between the job offered and claimant's physical limitations]. One searches in vain for something resembling a simple declarative statement by Dr. Black, either at trial or in written testimony, which says in clear and unambiguous language something to the effect that "Mr. Peters is capable of stepping into this specific job which is immediately available and at which he can earn at least 90% of his pre-injury wage."
On the retirement issue, the WCJ stated:
[Mr. Peters'] stated intention [to return to the workforce] must be viewed in light of his work record, which, as stated, consists of more than 38 [should be 28, as noted earlier in the reasons for judgment] years with the same employer. It takes a wider stretch than this Court is willing to take to reach the conclusion that this man is a malingerer who is looking for a way to gouge his employer, to escape from the labor force and to avoid work. His demeanor certainly did not suggest that to the Court and neither did the evidence, documentary or live.
On June 21, 2004, the WCJ signed a judgment denying GM's motion to modify. From this judgment, GM has appealed.

Discussion
The judgment appealed from is a motion to modify made under the authority of La. R.S. 23:1310.8, which allows the WCJ to retain continuing jurisdiction over most compensation matters.
A motion to modify is made by reference to a prior award of compensation. Matthews v. Farley Industries c/w Martin v. Texaco, Inc., 95-1387, 95-1796 (La.02/28/96), 668 So.2d 1144. Initially, GM voluntarily made payments. When it stopped payments, a trial was necessary and resulted in a judgment ordering indemnity benefits to be paid "for so long as claimant remains disabled."
In workers' compensation cases, the appropriate standard of review to be applied by the appellate court to the WCJ's findings of fact is the manifest error/clearly wrong standard. Dean v. Southmark Construction, 03-1051 (La.07/06/04), 879 So.2d 112; Alexander v. Pellerin Marble & Granite, 93-1698 (La.01/14/94), 630 So.2d 706; Figueroa v. Hardtner Medical Center, 35,678 (La.App.2d Cir.01/25/02), 805 So.2d 1267, appeal after remand, 37,568 (La.App.2d Cir.08/20/03), 852 So.2d 1187. In applying this standard, the court must determine not whether the trier of fact was wrong, but whether the factfinder's conclusion was a reasonable one. Howard v. Holyfield Construction, Inc., 38,728 (La.App.2d Cir.07/14/04), 878 So.2d 875. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Dean, supra; Longoria v. Brookshire Grocery Co., 37,975 (La.App.2d Cir.12/19/03), 862 So.2d 1172, writ denied, 04-0157 (La.04/23/04), 870 So.2d 299.
The manifest error/clearly wrong standard of appellate review applies in workers' compensation actions even when the tribunal's decision is based solely upon written reports, records, or depositions. Fite v. Louisiana Title Co., 02-2607 (La.06/27/03), 852 So.2d 983, on remand, 36,393 (La.App.2d Cir.10/24/03), 859 So.2d 259, writ denied, 03-3230 (La.02/20/04), 866 So.2d 829; Johnson v. Johnson Controls, 38,495 (La.App.2d Cir.05/12/04), 873 So.2d 923.
*721 The parties agree that Peters is receiving SEB and that the applicable statute regarding his entitlement to these benefits is La. R.S. 23:1221(3). As noted by the supreme court in Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.07/01/97), 696 So.2d 551, 556, quoting Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52 (La.1993), the purpose of SEB is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident.
With GM seeking to terminate a prior award of SEB, the issue is whether the WCJ erred in finding that the employer, GM, failed to prove the availability of a job that satisfies the criteria set forth in La. R.S. 23:1221(3)(c)(i).
In Banks, supra at 557, the supreme court held that an employer may discharge its burden of proving job availability by establishing, at a minimum, the following:
(1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
(2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
(3) an actual position available for that particular job at the time that the claimant received notification of the job's existence.
The Banks court further held that a "suitable job" was a position that claimant was not only physically capable of performing, but one that also fell within the limits of claimant's age, experience, and education, unless the employer or potential employer was willing to provide any additional necessary training or education. Id. at 557. See also Noto v. City of New Orleans Fire Dept., 04-0472 (La.App. 4th Cir.09/01/04), 883 So.2d 439; Lacaze v. Alliance Compressors, 03-1566 (La.App. 3d Cir.04/14/04), 870 So.2d 1150; City of Eunice v. Carrier, 02-1132 (La.App. 3d Cir.02/19/03), 844 So.2d 900, writ denied, 03-0813 (La.05/09/03), 843 So.2d 409; Wilson v. St. Mary Community Action, 00-2106 (La.App. 1st Cir.12/28/01), 803 So.2d 1106.
In the case sub judice, the question is whether the WCJ erred in finding that GM failed to prove that the job offered was within claimant's physical capabilities.
Peters, who had not been working for some time, returned to GM on May 22, 2003, for an appointment with Dr. Black for a fitness-for-duty examination. Dr. Black testified via deposition that Dr. M.E. Milstead, Peters' treating physician, had approved a set of restrictions proposed by Dr. Black, which included no repetitive flexion/extension of wrists or fingers, no vibratory tools and no lifting of more than 10-12 lbs. with either hand (or 20-24 lbs. total). The restrictions were sent to the GM rehabilitation department, or "ADAPT," where they were matched against a list of jobs available at the plant.
ADAPT identified an available job it believed was suitable for Peters given his restrictions. Claimant's new job was described as "L[eft] H[and] I [nstrument] P[anel] Secure." The recommendation by Gipson described the job as (syntax in original):
Employee, sit on side of truck, use both hands to hold I.P. up until operator secure I.P. top side, operator then secure I.P. using small power tool with less than 10 N[ewton] M[eters].
Peters began working in this position, but stated that he was physically unable to do the job. Claimant testified that the ADAPT description of this position was incomplete:
Q: What did he leave out?

*722 A: Well, there was another tool, another power tool that I had to use to secure, I can't remember what. But you had to use at least two, and I think it was three different power tools. Also, he left out the  you have to reach under there and snap these harnesses together which you have to use both hands and very, a lot of pressure trying to snap these harnesses. He didn't put that in there.
Peters implied that the power tools, or air guns, were vibrating tools that he was restricted from using.
Peters, who had a history of back and knee problems, including a previous back surgery in 1960, returned to the plant doctor on May 27, 2003, and complained of low back pain; he did not at that time complain of pain in his hands. He also saw Leroy Gipson at ADAPT; Gipson's report from May 27, 2003, states:
Mr. Peters came in today and said that he is unable to do the (L.H.I.P.secure) job because he cannot keep up with the line climbing in and out of the trucks. Mr. Peters said that he was having problems with his knees. He said that Dr. Black did not write any restrictions for his knee condition and he was going to see his Doctor.
On May 29, 2003, Peters returned to Dr. Milstead, and Dr. Michael Haynie, who practiced with Dr. Milstead, issued him further restrictions against getting in and out of the trucks on the assembly line. Specifically, the certificate to return to work states:
No climbing in and out of trucks  needs to work standing. Permanent restrictions.[1]
Peters saw Dr. Baer Rambach on June 5, 2003, with complaints of low back pain. Dr. Rambach found that Peters suffered from degenerative disc disease and recommended that claimant not do any work which would require bending, squatting, stooping, or climbing. Peters returned to Dr. Milstead on June 11, 2003; Dr. Milstead reported that claimant was "still doing about the same," continued to have "mild" carpal tunnel syndrome, had full flexion and extension of his fingers, and that Peters was at maximum medical improvement. Peters saw the plant physician, Dr. Black, again on June 17, 2003; on that date, Dr. Black noted the restrictions issued by Dr. Haynie and maintained Peters' carpal tunnel restrictions.
On June 19, 2003, Peters returned to Dr. Rambach with complaints of pain and discomfort in his lower back. Dr. Rambach observed that Peters had less than a 50% range of motion in his lumbosacral spine. Dr. Rambach referred claimant for physical therapy.
Having reviewed the record, we cannot say that the WCJ erred in finding that GM failed to establish that claimant was physically capable of performing the L.H.I.P. Secure job. Peters explained that the job description was incomplete in important aspects and did not include specific information about the extent of the use of power tools and the extent of movement into and out of the trucks on the line. Although the position may, arguably, have *723 been within the requirements set by the doctors for Peters' carpal tunnel problems, the job required bending and stooping that aggravated claimant's preexisting back and knee problems. The record shows that Peters complained of pain in these areas almost immediately after commencing the new position and continued treatment for his back and knee for a period of time after his retirement. A few days into this job, claimant's treating physician issued him restrictions from climbing in and out of the vehicles on the assembly line. This position, although available, was simply not suitable for Peters, given his physical restrictions, and the WCJ correctly found that GM failed to carry its burden under La. R.S. 23:1221(3)(c)(i).
GM finally asserts that the WCJ erred in finding that claimant was entitled to continued SEB based upon his conclusion that Peters had not withdrawn from the workforce.
La. R.S. 23:1221(3)(d)(iii) provides:
The right to supplemental earnings benefits pursuant to this paragraph shall in no event exceed a maximum of five hundred twenty weeks, but shall terminate ... when the employee retires;....
In Allen v. City of Shreveport, 93-2928 (La.05/23/94), 637 So.2d 123, the supreme court, interpreting a prior version of La. R.S. 23:1221(3)(d)(iii), held that a worker retires under La. R.S. 23:1221(3)(d)(iii) when that worker withdraws from the workforce or the worker draws old age social security benefits, whichever comes first. In Pierce v. Lafourche Parish Council, 99-2854 (La.05/16/00), 762 So.2d 608, the Louisiana Supreme Court found the portion of the prior version of R.S. 23:1221(3)(d)(iii) which terminated benefits upon the claimant's receipt of social security old age benefits unconstitutional and severed that part from the statute. As noted by the Fourth Circuit in Oestringer v. City of New Orleans, 03-2213 (La.App. 4th Cir.06/02/04), 876 So.2d 240, the supreme court in Pierce, supra, expressly declined to consider the constitutionality of that portion of the statute which terminated benefits upon the claimant's retirement.
The retirement referred to by La. R.S. 23:1221(3)(d)(iii) is not the failure to work because of disability. Allen, supra; Oestringer, supra. Instead, it refers to the worker who has no intention of returning to work regardless of disability. Id.
The fact that an employee may receive some form of pension or retirement benefits in connection with his retirement from a job because of disability does not constitute retirement under La. R.S. 23:1221(3)(d)(iii). Oestringer, supra. Where a worker has retired from a heavy work duty job but is still willing to take on light duty employment within the scope of the limitations imposed by his disabilities, then that worker is said not to have withdrawn from the workforce and is not considered to have retired under the statute. Id.; Palisi v. City of New Orleans Fire Dept., 95-1455 (La.App. 4th Cir.03/12/97), 690 So.2d 1018, writs denied, 97-0953, 97-1293 (La.06/20/97), 695 So.2d 1352, 1363.
On the other hand, an employee who expresses his intention to both retire or stop working and not look for other employment, and who makes no effort to find another job, has retired within the meaning of La. R.S. 23:1221. Randazzo v. Boh Brothers Construction Co., 01-1953 (La.App. 4th Cir.03/27/02), 814 So.2d 671, writ denied, 02-1162 (La.06/14/02), 818 So.2d 783; Lytle v. City of New Orleans Through New Orleans Fire Dept., 96-0039 (La.App. 4th Cir.09/11/96), 681 So.2d 12, writ denied, 96-2466 (La.12/13/96), 692 So.2d 372.
Peters admitted that he had not looked for employment since leaving GM, but stated that he intended to continue working *724 in some capacity when his hands/medical condition allowed him to do so. The evidence shows that claimant has not sought treatment for his carpal tunnel condition for some time and that he has likely reached maximum medical improvement regarding this condition. The evidence was equivocal concerning Peters' withdrawal from the workforce.
The WCJ had the opportunity in the previous trial to observe claimant testify and found him to be a credible witness. The WCJ carried over this observation to its reading of Peters' deposition testimony on the issue of his intent to retire/continue to work. Keeping in mind the precept that whether a claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the factfinder, Royals v. Town of Richwood, 38,738 (La.App.2d Cir.08/18/04), 880 So.2d 208; Harris v. Coushatta Industrial Sand, Inc., 31,977 (La.App.2d Cir.06/16/99), 741 So.2d 143, we are unable to say that the WCJ's choice between the alternative conclusions was clearly wrong.

Conclusion
For the reasons set forth above, the judgment of the WCJ is AFFIRMED. Costs are assessed to appellant, General Motors.
NOTES
[1] GM attempted again to place Peters in a job at the plant, this time in the L[eft] H[and] window regulator position, described by Gipson as:

Employee use(s) small power tool to secure window regulator, install tape to top of door.
However, this job was not available as it was taken by another plant worker with more seniority. Thereafter, GM did not attempt to place Peters in another job.