968 So.2d 270 (2007)
Archie GILLILAND, Jr., Plaintiff-Appellant
v.
CITY OF MONROE, Defendant-Appellee.
No. 42,458-WCA.
Court of Appeal of Louisiana, Second Circuit.
October 10, 2007.
Rehearing Denied November 29, 2007.
*271 Street & Street by C. Daniel Street, Monroe, for Appellant.
Nanci S. Summersgill, for Appellee.
Before CARAWAY, PEATROSS and MOORE, JJ.
CARAWAY, J.
After plaintiff's withdrawal from the workforce in 1997 following many years of service as a firefighter, he developed lung disease and brought this workers' compensation claim against the defendant pursuant to La. R.S. 33:2581, which addresses occupational diseases of firemen. From the medical evidence, the Workers' Compensation Judge ("WCJ") concluded that plaintiff's lung disease was manifested by symptoms arising after employment and did not develop during employment. Plaintiff appeals the denial of workers' compensation benefits. We find that despite the presumptions of occupational disease for firemen under the statute, the WCJ's conclusions are not manifestly erroneous. We affirm.

Facts
Archie Gilliland ("Gilliland") was employed by the City of Monroe (the "City") in the fire department for 33 years, from 1964 until 1997. He stopped working in April 1997, at age 58, and began receiving state retirement benefits. In addition to his employment as a fireman, Gilliland worked other part-time jobs to supplement his income between 1964 and 1987.
In January 1999, Gilliland was diagnosed with lung cancer and underwent a thoracotomy and partial lobectomy on January 23, 1999. He also suffered from emphysema, and a pulmonologist diagnosed chronic obstructive pulmonary disease ("COPD") shortly after his surgery.
After receiving the lung cancer diagnosis and undergoing surgery, Gilliland began receiving workers' compensation benefits in the form of supplemental earnings benefits ("SEBs") from the City. The City paid him $394/week from April 19, 1999, until it discontinued benefits on September 6, 2005. Three weeks later, Gilliland filed this claim with the Office of Workers' Compensation ("OWC").
The Form 1008 alleged a "Heart/lung act claimlung cancersurgery" and described Gilliland as a "Fireman disabled by lung cancer." Gilliland sought penalties and attorney's fees for wrongful discontinuance of indemnity benefits and the City's failure to approve necessary medical treatment. Gilliland claimed entitlement to SEBs and/or permanent total disability ("PTD"), legal interest and all costs. The City's answer disputed Gilliland's claim, alleging that his disability arose after his retirement from employment.
At trial, the parties stipulated that benefits were paid until September 6, 2005. Gilliland testified and discussed generally his exposure to smoke in carrying out his duties through the years. Gilliland acknowledged that he chewed tobacco and smoked cigarettes, but apparently stopped smoking a short time before his 1999 chest x-ray revealed an opacity in his lung. Numerous medical records and the deposition of one of Gilliland's doctors were introduced.
In the ruling, the WCJ considered the effect of La. R.S. 33:2581 on Gilliland's workers' compensation claim, in particular the statutory presumption that diseases of the heart and lung contracted by firefighters develop during and are caused by the firefighter's employment. The WCJ found that the City successfully overcame this statutory presumption of causation by showing medical evidence, and that Gilliland's COPD was also related to his smoking.
*272 The WCJ also found, alternatively, that under the jurisprudence, Gilliland had voluntarily withdrawn from the workplace for retirement in 1997. As a retiree, assuming disability occurred in 1999, he was only entitled to 104 weeks of SEBs under La. R.S. 23:1221(3)(d)(iii). The WCJ found the City paid SEBs from April 19, 1999, through September 6, 2005 (approximately 333 weeks), and had satisfied any obligation for payment of workers' compensation benefits to Gilliland. In reaching this conclusion, the WCJ also rejected Gilliland's argument that he was permanently and totally disabled under La. R.S. 23:1221(2)(c).
Gilliland appeals the judgment, raising the following issues:
1. Were the presumptions provided by the Heart and Lung Statute, La. R.S. 33:2581, overcome by the evidence presented by the City in this case?
2. Did Appellant prove with clear and convincing evidence that he is totally and permanently disabled?
3. Alternatively, did Appellant prove that he is entitled to supplemental earnings benefits?
4. In the event that Appellant is not totally and permanently disabled, was it proven that he voluntarily retired so as to limit his supplemental earnings benefits to one hundred four weeks?
5. Was this claim reasonably controverted so as to avoid the imposition of penalties and attorney fees?

Discussion
La. R.S. 33:2581 provides for firemen the Heart and Lung Act (the "Act"), as follows:
Any disease or infirmity of the heart or lungs which develops during a period of employment in the classified fire service in the state of Louisiana shall be classified as a disease or infirmity connected with employment. The employee affected, or his survivors, shall be entitled to all rights and benefits as granted by the laws of the state of Louisiana to which one suffering an occupational disease is entitled as service connected in the line of duty, regardless of whether the fireman is on duty at the time he is stricken with the disease or infirmity. Such disease or infirmity shall be presumed, prima facie, to have developed during employment and shall be presumed, prima facie, to have been caused by or to have resulted from the nature of the work performed whenever same is manifested at any time after the first five years of employment.
The Act's classification of the two health infirmities as occupational diseases entitles the fireman to workers' compensation benefits, and the general workers' compensation law applies. McElwee v. City of Bossier City, 34,345 (La.App. 2d Cir.12/6/00), 775 So.2d 588, writ denied, 01-0049 (La.3/9/01), 786 So.2d 737.
As originally enacted in 1968, the last sentence of the Act gave only a legal presumption that the lung or heart disease "developed during employment," after the fireman's first five years of employment. The first case that addressed the Act, Bates v. Bituminous Cas. Corp., 266 So.2d 556 (La.App. 3d Cir.1972), asserted that this initial legal presumption of the Act did not extend to the question of whether such diseases were presumed to be caused by the nature of the work of the fireman. The court concluded that the plaintiff's doctor was unable to express an opinion regarding whether the plaintiff's work as a fireman for ten years was the probable cause of his heart attack. The plaintiff was given the burden of proof; the fireman's heart condition was determined not to be work related; and workers' compensation benefits were denied.
*273 The narrow ruling in Bates can be criticized because the clear import of the first sentence of the Act, which remains unchanged from its original enactment, is that the development of the disease alone during employment results in an occupationally "connected" disease. See, Vincent v. City of New Orleans, 326 So.2d 401 (La.App. 4th Cir.1976), writ denied, 329 So.2d 760 (La.1976) (which refused to follow Bates, finding that the Act as originally enacted provided a rebuttable presumption that the nature of the work caused the disease). Nevertheless, in an apparent reaction to the Bates ruling, the Act was amended in 1975 to make clear that the Act provided a presumption of work-related causation after the first five years of employment.
Significantly, the language of the Act highlights a distinction between the development and manifestation of the disease. Gilliland asserts in this case the statute's presumption that his lung disease developed during his employment as a fireman even though the actual manifestation of his cancer occurred when he was no longer a fireman. He asserts that this presumption of the time of development of his disease and the work-related causation presumption were not recognized and applied properly by the WCJ. Citing jurisprudence of this court, Gilliland asserts that the Act shifted the burden of proof to the City and that it "had the difficult, almost impossible burden of proving the negativethat [Gilliland's] infirmity of the [lung] could not have resulted from his service as a fireman." McCoy v. City of Shreveport, 26,181 (La.App. 2d Cir.1/25/95), 649 So.2d 103, 109; Coats v. City of Bossier City, 31,164 (La.App. 2d Cir.10/30/98), 720 So.2d 1283, writ denied, 99-0019 (La.2/12/99), 738 So.2d 581. See also, McClure v. City of Pineville, 06-0279 (La.App. 3d Cir.12/6/06), 944 So.2d 795, writ denied, 07-0040 (La.3/9/07), 949 So.2d 445.
The legal presumption contained in the Act is an evidentiary presumption, bringing into play Code of Evidence Articles 301, et seq., which define the foundation, weight and other effects of such presumption. Upon the enactment of this legislation in 1997, the official comment to Article 301 observed:
(a) True evidentiary presumptions address evidentiary facts, not legal conclusions, and are classically styled in the form: "If A, then B," or more explicitly "If [evidentiary fact] A [is established], then [evidentiary fact] B [shall be considered established,] unless the opponent meets a certain specified burden. . . .
Article 304 provides that "[p]resumptions regulated by this Chapter are rebuttable presumptions and therefore may be controverted or overcome by appropriate evidence." To the contrary, a conclusive presumption set by legislation may not be controverted or overcome by evidence to the contrary. La. C.E. art. 303 and its Official Comment.
Article 302 provides the following definitions pertinent for the measure of the presumption afforded by the Act, as follows:
(1) The "burden of persuasion" is the burden of a party to establish a requisite degree of belief in the mind of the trier of fact as to the existence or nonexistence of a fact. Depending on the circumstances, the degree of belief may be by a preponderance of the evidence, by clear and convincing evidence, or as otherwise required by law.
(2) A "predicate fact" is a fact or group of facts which must be established for a party to be entitled to the benefits of a presumption.
(3) A "presumption" is an inference created by legislation that the trier of fact must draw if it finds the existence of the *274 predicate fact unless the trier of fact is persuaded by evidence of the nonexistence of the fact to be inferred. As used herein, it does not include a particular usage of the term "presumption" where the content, context, or history of the statute indicates an intention merely to authorize but not to require the trier of fact to draw an inference.
(4) An "inference" is a conclusion that an evidentiary fact exists based on the establishment of a predicate fact.
With these definitions, Article 306 provides as follows:
If the trier of fact finds the existence of the predicate fact, and if there is evidence controverting the fact to be inferred, it shall find the existence of the inferred fact unless it is persuaded by the controverting evidence of the nonexistence of the inferred fact.
In this case, the undisputed "predicate fact" was Gilliland's employment as a fireman for over five years. The "presumptions" the Act creates are two "inferences" which are the evidentiary facts supporting Gilliland's claim. It may be inferred (i) that Gilliland's lung disease developed during his employment, and (ii) that the disease was caused by his work as a fireman.
Significantly, these two inferred facts giving the plaintiff an evidentiary benefit are nonetheless circumstantially produced "inferences." They are not products of direct evidence pinpointing the exact timing of development of the disease or its etiology in relation to an identified risk encountered on the job. Moreover, since the statute provides no conclusive presumption but only an evidentiary benefit, Article 306 provides that the trier of fact need not credit the inference gained from the Act if "it is persuaded by the controverting evidence of the nonexistence of the inferred fact." That controverting evidence, likewise, may be circumstantial evidence, as would be expected for the frequently difficult task of identifying the development and cause of heart or lung disease. Thus, in a given case the trier of fact may choose circumstantial evidence that tends to disprove the statutory inferences gained under the Act. For example, a fireman who worked for five years and leaves employment with the department at age 30, would find the statutory inferences of the Act for an occupational disease claim greatly overshadowed by other inferences concerning his heart disease first experienced at age 75.
There being no conclusive presumption given by the Act, dictum in the jurisprudence of the "almost impossible burden of proving a negative" does not accurately comport with the evidentiary considerations that were before the WCJ after the clarifying 1997 legislation in Articles 304 and 306 providing for the evidentiary treatment of rebuttable presumptions. That dictum in many of the cases was expressed in a context where the fireman was disabled by the manifestation of the heart or lung disease during employment or immediately after retirement. Yet, with the passage of time after termination of work as a fireman, controverting evidence, circumstantial or otherwise, can arise that may alter the evidentiary equation allowing the statutory classification of the diseases as inferentially occupational to be overcome.
Finally, before reviewing the competing inferences from the evidence before the WCJ, we note that the Act has never been interpreted by our highest court and that the majority of reported cases do not involve the manifestation of the disease after the termination of work. No case has ever employed the 1997 Code of Evidence provisions for the measure of the evidence in rebuttal of the Act's evidentiary presumptions. With this backdrop, we *275 must determine whether, as asserted by appellant, the WCJ was manifestly in error in crediting evidence that inadequately controverts the inferred facts of the statute supporting the fireman's claim. Edwards v. Sawyer Indus. Plastics, Inc., 99-2676 (La.6/30/00), 765 So.2d 328, citing Bruno v. Harbert Int'l, Inc., 593 So.2d 357 (La.1992); Peters v. General Motors Corp., 39,279 (La.App. 2d Cir.1/26/05), 892 So.2d 717. The manifest error/clearly wrong standard of appellate review applies in workers' compensation actions even when the tribunal's decision is based solely upon written reports, records, or depositions. Peters v. General Motors Corp., supra.
Gilliland's 1008 claim form alleged an occupational disease of his lungs beginning in October 1998. Although Gilliland's cancer was specifically identified as the disease, the medical evidence at trial revealed two lung diseases: (1) COPD; and (2) carcinoid tumor of the right lung. After his lung surgery on January 23, 1999, claimant continued to experience symptoms of shortness of breath (or dyspnea) and breathing problems. The cancer related to the removed tumor remains in remission.
COPD
Appellant's family physician, Dr. Warren Daniel, treated claimant beginning in 1984. In his testimony, Gilliland reported having bronchitis and breathing problems as early as the 1980s. On December 14, 1996, Gilliland was in a motor vehicle accident and hurt his back. He retired in the spring of 1997. In mid-October 1997, appellant complained of shortness of breath when seeking treatment for a sore throat. Significantly, the 1997 chest x-ray was "negative for pulmonary disease." When Gilliland saw Dr. Daniel on March 10, 1998, again for chest pain, he reported smoking one pack of cigarettes per day.[1]
On January 4, 1999, he saw Dr. Daniel and complained of pain in his mid-chest and shortness of breath with minimal activity, lasting two months. The result of a chest x-ray that day showed emphysematous lungs and an "ill-defined opacity" in the right lower lung. A January 7, 1999 CT scan revealed "an ill-defined area of increased density" with "a somewhat nodular appearance . . . extend[ing] outward to the periphery of the lung."
Thereafter, Dr. Thomas J. Gullatt, a pulmonologist, saw claimant by referral on January 13, 1999. Dr. Gullatt obtained medical history that Gilliland reported having been a one pack per day smoker for 25 years, but stopped smoking the year before. He diagnosed two problems: exertional dyspnea of uncertain etiology, and an inflammatory area in the right infrahilar region. The results of a pulmonary function test led to Gilliland being diagnosed with "some mild COPD," which Dr. Gullatt considered "mild" in relation to the amount of symptoms Gilliland was experiencing. Dr. Gullatt felt the "mild to moderate COPD . . . could be an aspect of the patient's occupational exposure as a fireman and being exposed to pollutants, hazardous materials, smoke, etc."
In August 2001 and after the removal of a portion of the lung, Dr. Gullatt diagnosed the worsening exertional dyspnea as a chronic, recurrent problem. A pulmonary function study suggested "marginal reduction in FEV-1/FVC ration," "borderline obstructive impairment," and "no evidence of restrictive impairment." Two years later, on August 6, 2003, Dr. Gullatt evaluated Gilliland again after a spirogram and *276 wrote, "his pulmonary function indicates significant limitations to his ability to exert himself and undergo vigorous activity."
Also in February 1999, Dr. Coy Gammage, an oncologist, began treating Gilliland post-operatively. Dr. Gammage defined COPD as a lung problem most commonly associated with cigarette smoking, that may also occur with other "pulmonary-type exposures" to smoke.
Dr. Ronald Hammett treated Gilliland after Dr. Gullatt's practice closed, beginning on February 15, 2005. Pulmonary function testing on February 16, 2005, showed "mild obstructive or restrictive ventilatory dysfunction." Dr. Hammett prescribed home oxygen for Gilliland to wear while sleeping and to alleviate exertional dyspnea. Dr. Hammett's letter dated December 21, 2005, stated he treated Gilliland for chronic lung disease and that claimant was "chronically debilitated as a result of" his 1999 surgery and therapy, and also suffered from hypertension. Claimant's two check-up visits to Dr. Hammett in 2006, on April 12 and July 5, showed little change. His last pulmonary function test on July 20, 2006, found the same problem, "mild or minimal obstructive ventilatory dysfunction." Dr. Daniel's letter dated February 23, 2006, also stated that claimant was "chronically debilitated."
Carcinoid Tumor
The bronchoscopy performed by Dr. Gullatt in January 1999 revealed a polypoid lesion in the lateral segment of the right lower lung, and a biopsy showed positive pathology for a carcinoid tumor. Dr. William Ferguson, a thoracic surgeon, operated on claimant's right lung and removed the tumor. Dr. Ferguson's admission note reflects that he was "not convinced that the endobronchial lesion that was seen by Dr. Gullatt in biopsy and proved to be a carcinoid tumor is necessarily related to all his symptoms." The doctor noted Gilliland had been a fireman and expressed some question about the long-term inhalation of smoke. Dr. Ferguson thought this could be a "possible etiology" of his problem and also noted his history of smoking until one year before his lung surgery.
Dr. Gammage testified by deposition that claimant did not need adjuvant therapy after his thoracotomy. Routine testing conducted periodically never revealed any recurrence of metastatic disease in Gilliland's lungs. By 2005, claimant's chest x-ray was characterized as "radiologically stable."
As for when the excised tumor developed, Dr. Gammage stated there were two basic types of tumors. An atypical variety is aggressive and rapidly growing, and the more typical carcinoid tumors which grew more slowly. In his opinion, claimant had the slow-growing type, which was also suggested by his remaining cancer-free since 1999. In Dr. Gammage's opinion, the cancer could possibly have taken years to grow large enough to have been identified. Nevertheless, he said, "exactly how long it takes from some kind of exposure, genetic change, . . . to eventually lead to a malignancy development, is kind of up to debate."
Concerning the issue of whether the tumor was work-related, Dr. Gammage expressed the following:
So we basically really don't have a good understanding of what may or may not actually lead to the development of a carcinoid tumor. So, you know, weyou know, they are fairly certain that cigarette smoke does not. But whether other types of chemical exposures will, nobody knows that. It's generally thought that some potential risk factors are, you know, related to genetics, specifically about a condition called multiple endocrine neoplasia. But as regards to some *277 sort of chemical toxic exposure, nobody knows.
Finally, Dr. Gammage stated that claimant was not disabled from cancer because he is in remission. Nevertheless, he opined that Gilliland was disabled from working as a fireman due to his diminished pulmonary capacity resulting from COPD and the partial lobectomy. At the time of his 2006 deposition, Dr. Gammage agreed that, even at age 65, Gilliland could perform a part-time, sedentary job.
Regarding the COPD, the WCJ placed great weight on Gilliland's post-retirement chest x-ray in 1997 which showed no active pulmonary disease. Despite Gilliland's testimony of his prior shortness of breath, the inferred fact gained by the Act's presumption that COPD developed during employment is reasonably disputed by the results of the chest x-ray. The presumption of the Act that the COPD had a work-related causation found support from some of the medical records. Nevertheless, Dr. Gammage in his testimony suggested that the most common cause of COPD was cigarette smoking. The manifestation of COPD in late 1998 was also complicated by the fact of Gilliland's tumor and the lung surgery in early 1999. From this medical evidence, we find that there was sufficient controverting evidence of the time of the development of COPD and its work-related causation. The WCJ was not clearly wrong in rejecting COPD as an occupational disease.
Regarding Gilliland's carcinoid tumor, Dr. Gammage's testimony was clear that smoke-related causation was unlikely. He attributed genetics as the only known cause for such tumor. This testimony controverts the inferred fact of work-related causation provided by the Act. Also, the 1997 chest x-ray strongly indicates that the development of the tumor may not have even begun during Gilliland's prior employment. Thus, the WCJ's conclusion of no occupational disease regarding the tumor is not clearly wrong.
In summary, we recognize that the choice between the statutory "inferences" and the inferences tending to dispute Gilliland's disease as occupationally related makes this a close case and a difficult one for review under the manifest error standard. However, unless the statutory inferred facts or "inferences" receive higher evidentiary weight than the controverting inferences from the medical evidence discussed above, the WCJ's choice between the reasonable competing inferences was not clearly wrong. The Code of Evidence provisions on rebuttable presumptions do not require any higher burden of persuasion to overcome the statutory inferred facts. La. C.E. art. 306. Accordingly, we affirm the ruling of the WCJ finding the absence of an occupational disease.[2]

Conclusion
For the foregoing reasons, the trial court judgment is AFFIRMED. Costs of the appeal are assessed to appellant.
AFFIRMED.
APPLICATION FOR REHEARING
Before GASKINS, CARAWAY, PEATROSS, MOORE and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] Gilliland's overall medical records support the conclusion that he stopped smoking in April 1998.
[2] We are therefore not required to address the WCJ's alternative ruling denying the further payment of SEBs under the authority of La. R.S. 23:1221(3)(d)(iii). Because of the overwhelming evidence of Gilliland's retirement and withdrawal from the workforce in 1997, the ruling also appears correct. See, Peters v. General Motors Corp., 39,279 (La.App. 2d Cir.1/26/05), 892 So.2d 717.