| | | |
|---|---|---|
| **FLOYD SAFFORD** | * | **NO. 2023-CA-0495** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **NEW ORLEANS FIRE** | * | |
| **DEPARTMENT** | | **FOURTH CIRCUIT** |
| | * | |
| | | **STATE OF LOUISIANA** |

* * * * * * *

APPEAL FROM
THE OFFICE OF WORKERS' COMPENSATION
NO. 15-01981, DISTRICT "08"
Honorable Catrice Johnson-Reid, The Office of Workers' Compensation
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Tiffany Gautier Chase, Judge Dale N. Atkins)

Julie Richard Spencer
Louis Robein
ROBEIN, URANN, SPENCER, PICARD & CANGEMI, APLC
2540 Severn Avenue, Suite 400
Metairie, LA 70002

  COUNSEL FOR PLAINTIFF/APPELLEE, Floyd Safford

Christopher M. Landry
John D. Mineo, IV
THE MONSON LAW FIRM, LLC
5 Sanctuary Blvd., Suite 101
Mandeville, LA 70471

  COUNSEL FOR DEFENDANT/APPELLANT, New Orleans Fire
Department

**AFFIRMED
FEBRUARY 1, 2024**

DNA

JCL

TGC

This is a workers' compensation case. Appellant, the New Orleans Fire Department ("NOFD"), appeals the June 7, 2022 judgment rendered by the workers' compensation judge ("WCJ"), which denied the Motion for New Trial filed by the NOFD. The NOFD filed the Motion for New Trial regarding the WCJ's April 11, 2022 judgment, which held that Appellee, Floyd Safford ("Mr. Safford"), satisfied his burden of proving that he had an occupational disease covered by the Firefighter's Heart and Lung Act (La. R.S. 33:2581)[1] and that he was disabled from working as a firefighter or otherwise earning 90% of his pre-injury wages as a result of his illness. The judgment further ordered that Mr. Safford was entitled to supplemental earnings benefits of $438.00 per week for the time period from January 1, 2015, until June 15, 2020. For the following reasons, we affirm.

---

[1] Textual references will refer to this as "the Firefighter's Heart and Lung Act," while citations will be to La. R.S. 33:2581.

1

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Mr. Safford began working for the NOFD on January 7, 1975.[2] On November 7, 1997, while on duty, Mr. Safford suffered a cardiac event and received treatment at the emergency room, where his diagnosis was a possible mitral valve prolapse; but he subsequently returned to work and did not miss any further time at work over the years due to this cardiac event. Years later, on December 8, 2004, Mr. Safford severely injured his left hand while working: Mr. Safford never returned to fulltime work as a firefighter after his hand injury, and he had to undergo surgery on his hand on May 13, 2005. Then, on January 15, 2006, Mr. Safford retired from the NOFD and began to receive a disability pension. Though Mr. Safford testified in a deposition that his primary reason for retirement was his disability due to his hand injury, he also cited his cardiac condition as a contributing factor. The next month, on February 1, 2006, the NOFD began to pay supplemental earnings benefits to Mr. Safford for his hand injury.

Thereafter, Mr. Safford suffered another cardiac event in 2009, at which time he was diagnosed with atrial fibrillation rather than mitral valve prolapse. On June 11, 2010, Mr. Safford filed a workers' compensation claim for his cardiac condition under the Firefighter's Heart and Lung Act. On his "Employee's Report of Occupational Injury or Disease" form, Mr. Safford listed the dates of his injury as November 7, 1997; August 11, 2009; November 25, 2009; February 17, 2010; and June 5, 2010. Additionally, on that form, Mr. Safford made a notation that the purpose of the report was "medical only." Thereafter, the NOFD began paying Mr.

_____

[2] At the outset, we note that this matter has previously been before this Court on appeal. *See Safford v. Hammerman & Gainer Int'l, Inc.*, 2016-0209 (La. App. 4 Cir. 7/20/16), 198 So.3d 227. Some of the relevant facts and procedure delineated in that Opinion are reiterated in this Opinion.

2

Safford's medical bills for his cardiac condition retroactive to the filing of his claim (i.e., June 11, 2010). Mr. Safford also received a letter dated January 24, 2011, from the NOFD's third-party administrator, CCSMI, which stated: "[t]his letter is to inform you we received notice of your Heart and Lung claim on 6/16/10. After investigation and our [s]econd [m]edical opinion doctor agreed with your physician[,] [y]our claim has been accepted under the [Firefighter's] Heart and Lung [A]ct effective 6/11/10."

On December 31, 2014, the NOFD stopped paying supplemental earnings benefits to Mr. Safford for his hand injury because the NOFD had complied with its 520-week indemnity obligation under the Louisiana Workers' Compensation Act.[3] Thereafter, at the start of 2015, Mr. Safford began to seek supplemental earnings benefits for his cardiac condition and ultimately, on March 31, 2015, filed a Disputed Claim for Compensation ("Form 1008"), in which he alleged that he "was treated for a cardiac condition beginning 9/24/09. Carl Levie [sic], M.D. confirmed Dr. [Bruce] Iteld['s] and Dr. [Vasanth] Bethala's diagnosis of atrial fibrillation on 9/28/10." On the Form 1008, Mr. Safford identified the bona-fide dispute as "[n]o wage benefits have been paid."

In response, on July 28, 2015, the NOFD filed an exception of prescription, contending that any claim Mr. Safford had for indemnity benefits from his cardiac condition had prescribed; and the WCJ granted the NOFD's exception of prescription on November 4, 2015. Mr. Safford filed an appeal regarding that judgment; and, on July 20, 2016, this Court reversed the trial court's grant of the NOFD's exception of prescription and remanded the matter. *Safford*, 2016-0209, p.

---

[3] According to La. R.S. 23:1221(3)(d), a claimant's "right to supplemental earnings benefits . . . shall in no event exceed a maximum of five hundred twenty weeks . . . ."

3

13, 198 So.3d at 236. Thereafter, on December 16, 2016, the Louisiana Supreme Court granted a writ application filed by the NOFD. *Safford v. Hammerman & Gainer Int'l Inc.*, 2016-1591 (La. 12/16/16), 211 So.3d 1165. However, on May 3, 2017, the Louisiana Supreme Court "recall[ed] [its] order of December 16, 2016[,] as improvidently granted" and denied the NOFD's writ application. *Safford v. Hammerman & Gainer Int'l, Inc.*, 2016-1591 (La. 5/3/17), 224 So.3d 946. After the Louisiana Supreme Court recalled its order, the matter proceeded once again before the WCJ.

*TRIAL*

After numerous delays, this matter finally proceeded to trial on January 25, 2021, and February 11, 2021. The issue at trial centered on whether Mr. Safford was entitled to supplemental earnings benefits for his atrial fibrillation. At the January 25, 2021 proceeding, the parties stipulated that if the WCJ were to find that Mr. Safford was entitled to supplemental earnings benefits, that these benefits would be limited to the amount of $438 per week for a time period running from January 1, 2015, through June 11, 2020.[4] At the January 25, 2021 proceeding, counsel for the parties entered exhibits into the record.

*Exhibits*

The pertinent exhibits admitted at trial included the medical records from the NOFD's choice of physician, Dr. Carl "Chip" Lavie ("Dr. Lavie"), the report by the court-appointed independent medical examiner ("IME"), Dr. Glenn Kelley ("Dr. Kelley"); and the deposition of Mr. Safford's treating physician, Dr. Bruce Iteld ("Dr. Iteld"). The relevant aspects of these exhibits are summarized below.

---

[4] The transcript of these proceedings reveals that counsel for the parties merely entered exhibits into the record on January 25, 2021, and the WCJ continued the matter to February 11, 2021, due to possible COVID-19 exposure.

### 1. *Medical Records from Dr. Lavie*

The NOFD entered the medical records from Dr. Lavie, the NOFD's choice of physician, into evidence. The notes from Mr. Safford's September 28, 2010 visit with Dr. Lavie include atrial fibrillation as one of the impressions. On the same date as that visit, Dr. Lavie also wrote a letter to the NOFD's third-party administrator, in which Dr. Lavie stated that thirteen years prior Mr. Safford "developed atrial fibrillation which caused considerable difficulty over the years." In particular, Dr. Lavie stated that Mr. Safford "was having numerous occurrences of atrial fibrillation, which caused him significant anxiety, trouble sleeping, and required several emergency room visits" for many years. Dr. Lavie's letter further stated that Mr. Safford's 2006 retirement was "presumably due to a hand injury" and was "certainly unrelated with the atrial fibrillation." In his letter, Dr. Lavie explained that Mr. Safford reported "his atrial fibrillation is much less and he is having only a rare episode which resolves in less than one hour." Dr. Lavie also noted that Mr. Safford's "prognosis from the atrial fibrillation is extremely good," and he concluded that "atrial fibrillation would not be a cause of disability as [Mr. Safford] clearly continued to work as a fireman for many years after his first episodes of atrial fibrillation."

The records from Dr. Lavie also included a letter dated April 4, 2017, in which Dr. Lavie stated that he saw Mr. Safford again on April 3, 2017.[5] Dr. Lavie noted that Mr. Safford "still occasionally has a bout of atrial fibrillation." In pertinent part, Dr. Lavie concluded that "[t]here would be no disability from atrial fibrillation . . . related to almost any occupation, and although being a fireman is

---

[5] Based on Dr. Lavie's April 4, 2017 letter, he did not see Mr. Safford in between the September 28, 2010 visit and the April 3, 2017 visit.

extremely intense work, he should even be able to work as a fireman with atrial fibrillation." Dr. Lavie also stated that "Mr. Safford could indefinitely work from a cardiac standpoint" and that "[f]rom [Mr. Safford's] cardiac condition, there would be no significant work limitations." However, Dr. Lavie additionally noted that "[o]bviously, extreme[ly] stressful situations could increase the chance of atrial fibrillation."

A May 18, 2019 letter from Dr. Lavie was also included as part of the exhibit. Therein, Dr. Lavie wrote:

> When I first met Mr. Safford in 2010, I was told that he had developed atrial fibrillation (AF) nearly 13 years ago and had been treated for AF for many years while being a firefighter. He was later "disabled" from the Fire Department for several years, not due to the AF, but rather from a hand injury. Although Mr. Safford had difficulty with his AF on a number of occasions, this never caused him to stop working or be disabled from the Fire Department. Why many years after the fact it is being argued that he should have been disabled due to AF is surprising to me. In fact, AF should hardly ever be a cause of disability.

Dr. Lavie concluded that Mr. Safford's atrial fibrillation did not cause him to be disabled while he still worked as a firefighter or at the present time (i.e., when Dr. Lavie wrote the May 18, 2019 letter.)

Finally, a May 22, 2020 letter from Dr. Lavie stated that he reviewed Dr. Kelley's January 30, 2020 IME report and agreed with Dr. Kelley's statements contained therein.

2.    *Dr. Kelley's IME Report*

Dr. Kelley, the IME, issued a report to the WCJ regarding Mr. Safford on January 30, 2020, after evaluating Mr. Safford on July 23, 2019. At the outset, Dr. Kelley explained that Mr. Safford initially "was able to restore his normal heart rhythm by means of exercise [during his atrial fibrillation episodes] but eventually

required membrane active anti-arrhythmic therapy to control his heart rhythm" and that he ultimately "became refractory to" the medicine he initially received for his atrial fibrillation. In pertinent part, Dr. Kelley also reported that Mr. Safford noted "that he never experienced an episode of [heart] palpitations while he was working as a fireman." Dr. Kelley concluded that he "[did] not think the presence of atrial fibrillation disabled Mr. Safford in any way from working as a fireman." Further, Dr. Kelley stated that he "agree[d] with Dr. Lavie that Mr. Safford could work indefinitely from a cardiac standpoint."

3.      *Dr. Iteld's Deposition*

Dr. Iteld, Mr. Safford's treating physician, sat for a deposition in this matter on June 27, 2019, and testified that he had been treating Mr. Safford since July 30, 2010, as his general cardiologist, at which time Mr. Safford reported with atrial fibrillation as one of his chief complaints. Dr. Iteld then described atrial fibrillation:

> Atrial fibrillation is a very common arrhythmia[6] which is initiated in the atrium, which is the upper chamber of the heart. . . . [A]s you well know if you feel your pulse, you have a regular heartbeat in most instances. With atrial fibrillation, you become what we call irregularly irregular. So it is random beating of the heart, and it could be very fast random or it could be controlled random. And this can either be intermittent, which we call paroxysmal, or it could last for three, four, five, ten days, and they need conversion by electrical shock or medications, and [that is] called persistent atrial fibrillation.

Dr. Iteld explained that he diagnosed Mr. Safford with paroxysmal atrial fibrillation.

Counsel for the NOFD asked Dr. Iteld about the frequency of Mr. Safford's atrial fibrillation episodes, and Dr. Iteld responded that Mr. Safford had

---

6 Later in his deposition Dr. Iteld defined arrhythmia as an abnormal rhythm, such as a rapid heartbeat.

experienced more atrial fibrillation events in the previous five years of treatment than in the first seven or eight years of treatment. Dr. Iteld further noted that Mr. Safford had been hospitalized for an atrial fibrillation episode in 2017 and confirmed that he "had to convert [Mr. Safford] from a medical standpoint" on that same occasion. Additionally, Dr. Iteld explained that Mr. Safford wore a loop recorder, which registered and reported his heart's activity: Dr. Iteld stated that from when the loop recorder was initially placed on April 25, 2017, until May 11, 2019, Mr. Safford had experienced sixty-one episodes of atrial fibrillation, though Dr. Iteld clarified that many of these constituted asymptomatic episodes.

Repeating the history Mr. Safford had provided to him during his first visit on July 30, 2010, Dr. Iteld read aloud: "He states that [the paroxysmal atrial fibrillation episodes] started in 1997 and [have] progressively increased in frequency and duration to the point where he has at least two episodes per month, and these episodes can last anywhere from . . . three to five minutes up [to] 24 hours." Dr. Iteld expounded that the increased frequency of the episodes was one of the reasons Mr. Safford went to him for treatment, noting that Mr. Safford reported that he did not feel well and realized that his current treatment regime did not really treat his atrial fibrillation. In particular, Dr. Iteld stated that Mr. Safford reported that "he [could not] function normally" and "felt lousy when he had" atrial fibrillation episodes. Dr. Iteld further explained that Mr. Safford "was really scared of" the atrial fibrillation episodes.

When asked whether Mr. Safford was still working as a firefighter at the time of his first visit or if Mr. Safford had retired, Dr. Iteld did not recall knowing that Mr. Safford was already retired at the time of his first visit. Dr. Iteld testified that he did not restrict any of Mr. Safford's activities at the time of the initial visit

8

nor did he issue a report or render an opinion stating that Mr. Safford was disabled or unable to work as a firefighter. However, the following colloquy occurred as to whether Dr. Iteld ever concluded that Mr. Safford was disabled from his atrial fibrillation:

> Q     Did you ever tell Mr. Safford that your opinion would have been he would have been disabled during the time you treated him from being a firefighter?
>
> A     We talked about that specifically.
>
> Q     When?
>
> A     During our visits.
>
> Q     But you never put that down in writing?
>
> A     No.
>
> . . . .
>
> A     [Let us] go back to 2017 when he had the episode and he was hospitalized.
>
> Q     Uh-huh.
>
> A     He [did not] get hospitalized cause he felt good, he went because he was scared and he felt bad. And to me, when [you are] a fireman, you [do not] know when [you are] going to be fighting a fire, and you [do not] know when the next episode of atrial fibrillation is going to occur. Now, if it occurs . . . while [a firefighter is] in the middle of a fire and [he is] in a building and he has to do something that will protect his fellow firefighters or whatever his responsibility is, he may not be able to do it.
>
> . . . .
>
> Q     Okay. And I guess my question is, at what point in time do you believe Mr. Safford became disabled, so-to-speak, from returning to work as a firefighter during the time you treated him? Was there one specific event, was there something that [led] you to the conclusion that you disagreed with Dr. Lavie about [Mr. Safford's] ability to work as a firefighter?
>
> A     Well, as you know, in 2017, [Mr. Safford] was admitted to the hospital. That was out of nowhere, out of chance. So the point is

. . . knowing that one time it could happen. It could cost the life of somebody . . . or him, and under those circumstances, you know, [it is] an all-or-nothing situation. Either you can say he can practice until he has a near episode or an episode during a fire and endangers himself or someone else suffers because he [cannot] do his job, so you wait until that happens? When someone has a bad heart, do you wait until they have a heart attack to fix the vessels, or do you fix it before?

. . . .

Q    [I am] trying to pinpoint, if you can, [I am] trying to understand if someone has atrial fibrillation and is able to do their job, particularly a firefighter, for seven years with that problem and continues to have the same problem up until today, how is he able to work for seven years and then all of a sudden he [cannot] work . . . ? Do you understand what [I am] asking you[?]

A    . . . He would have an episode of atrial fibrillation which would render him weak, [unable] to think properly, and in the middle of a fire, I [do not] know how, you know – it [does not] make any sense to me. And [I am] his doctor. I started taking care of him.

Q    Uh-huh.

A    So I know him. I [cannot] just say, oh, well, when it happens, [we will] talk about it after the next time it happens if he were a firem[a]n, okay? And [I will] be honest with you, we never talked about whether he was retired or anything, that [was not] how our relationship was, doctor-patient. So what [I am] trying to say is, I know the man, and for me to say well, [we will] wait until it happens again and [we will] see how you deal with it, and if something happened to him, then I would be responsible. I would feel terrible. And Dr. Lavie is one of the smartest physicians I know. [He is] a good guy, a friend, but [I am] telling you, [it is] not his patient. And as an evaluator, [it is] easy to evaluate people and just cut it off as soon as [you are] finished evaluating them, and [that is] not how my relationship is with [Mr. Safford]. And [that is] all.

Q    I guess [I am] just trying to understand your opinion. So your opinion is you would have disabled him because of the possibility that he could have an [atrial fibrillation] event which would affect his ability to finish his job as a firefighter; for instance if he was fighting a fire? [That is] the entirety of your opinion on disability?

A    Correct. Also, the job he did. I mean, he [did not] sit around at a desk all day, you know. When there was a fire, he went and fought it.

Again discussing his thoughts on Dr. Lavie's opinion in this matter, Dr. Iteld testified that he agreed with Dr. Lavie's statement that "atrial fibrillation should hardly ever be a cause of disability." However, Dr. Iteld disagreed with Dr. Lavie's conclusion that Mr. Safford's atrial fibrillation did not disable him from working as a firefighter, citing three reasons. First, Dr. Iteld stated that atrial fibrillation is a cause of disability in Mr. Safford's case because "there are people [like Mr. Safford] who become crippled when they have episodes [be]cause they [do not] feel well." Second, Dr. Iteld explained that Mr. Safford's atrial fibrillation is a cause of disability because of the nature of his work as a firefighter. Third, Dr. Iteld stated that Mr. Safford's atrial fibrillation is not completely controlled with medicine. Expanding upon these reasons, Dr. Iteld testified:

> [A]     [I]f I could tell you when he was going to have his episodes, I would make a schedule for him to work the days that he [was not] going to have it, and then I would tell you he would be perfect as a firefighter. If he said to me he was going to go do a desk job or do something else, I have no problem with [that]. But physical activity requiring life and death decisions and taking care of other people, . . . [it is] just not going to work, [it is] a different situation. [It is] a life or death situation.
>
> Q     So [you are] basing your opinions regarding Mr. Safford because [he is] a firefighter as far as disability?
>
> A     Correct, correct.
>
> . . . .
>
> Q     Okay. Based on your testimony, am I to understand that any firefighter that comes to see you that you diagnose with atrial fibrillation you would disable from working as a firefighter?
>
> A     Unless the medication totally eliminated the episodes.
>
> Q     Okay.
>
> A     And if the firefighter tolerated atrial fibrillation and did not feel bad and it [did not] bother him, I would be more inclined to let him do it.

11

Q [Is not] that the case, though, with Mr. Safford, because he had atrial fibrillation and worked full duty for seven years before he retired for an unrelated event, he would fit in that category . . . ?

A Well, not really. He is very symptomatic when he has a regular episode.

When asked whether Mr. Safford's current treatment regime was effective, Dr. Iteld testified that Mr. Safford still experienced atrial fibrillation episodes but that they were less frequent than they had been in the past.

Counsel for Mr. Safford asked Dr. Iteld about a February 2010 episode of atrial fibrillation, for which Mr. Safford had to be hospitalized. Thereafter, when questioned by counsel for Mr. Safford, the following colloquy occurred regarding Dr. Iteld's opinion that Mr. Safford was disabled from working as a firefighter:

Q Okay. . . . So, . . . if [Mr. Safford] could work for seven years as a firefighter [between 1997 and 2004], why [could he not] work in 2010 as a firefighter or why [could he not] work now as a firefighter?

A For the same reason [as] what happened in 2010, when he has an episode, [he is] debilitated.

Dr. Iteld answered affirmatively when asked whether it was his medical opinion that Mr. Safford's atrial fibrillation would have prevented him from working as a firefighter for the entire time that Dr. Iteld had been treating him.

*Mr. Safford's Testimony*

When the matter continued on February 11, 2021, Mr. Safford testified and stated that he was presently unemployed and "on disability retirement with the New Orleans Fire Department." He explained that his last day working for the NOFD was in December 2004, when he injured his hand, after which time his doctor informed him that he was incapable of returning to work due to his hand injury. Mr. Safford testified, however, that he would have continued working for

the NOFD if not for his hand injury and that he applied for jobs elsewhere after accepting his disability pension from the NOFD in 2006.

Regarding his cardiac condition, Mr. Safford stated that a doctor diagnosed him with mitral valve prolapse in 1997 after he experienced chest pain at work. Mr. Safford explained that the doctor released him back to work but that he subsequently "out of nowhere" would occasionally experience "these episodes . . . feel[ing] [a] crushing pain in [his] chest," as well as dizziness, rapid breathing, faintness, and chest and heart pain. He further explained that "[o]ver time, [the episodes] became more frequent and much . . . longer in duration." Mr. Safford stated that he next received treatment for his cardiac condition in August 2009 at which time Dr. Vasanth Bethala diagnosed him with atrial fibrillation rather than a mitral valve prolapse. Subsequently, according to Mr. Safford, he received a referral to Dr. Iteld in June 2010, from whom he was still receiving treatment at the time of trial. Initially, as Mr. Safford explained, the medications prescribed by Dr. Iteld left Mr. Safford with only "mild" atrial fibrillation episodes, but he had episodes in 2017 and 2018 that required hospitalization. In total, Mr. Safford stated that he had been hospitalized six times for his cardiac condition.

When asked how he felt his atrial fibrillation episodes would affect his ability to work, particularly in a high stress environment like firefighting, Mr. Safford responded:

> [I am] of the opinion that, certainly, if I went into an [atrial fibrillation] attack inside of a fire scene, [I would] have to get out of there right away, if I was able to get out on my own.
>
> And whoever was in there with me has to . . . get out of there also. I just, [I have] been through these [atrial fibrillations] many times and I, [it is] hard for me to fathom having all that gear on me and being inside of a burning building and having [atrial fibrillation],

13

all of a sudden getting dizzy, lightheaded, my heart is, my breathing is racing.

> If [I am] on an air tank, [I have] only . . . thirty minutes of air and if I start hyperventilating, [I have] . . . to get out of there. The whole scenario, [it is] not, I [would not] feel safe, for myself or anybody else.

Mr. Safford also described the process of responding to a fire and the effort required of a firefighter:

> [We have] . . . to turn our gear on and our air tanks and that alone is another extra hundred pounds of gear on us. We get a hose line and if we can make an interior attack, we get inside the building as soon as we can to try to get that fire out.

> [We have] . . . to haul that, pull that hose. The hose has about 130 pounds of pressure pushing against us.

> When that water hits that fire, it turns to steam which helps to put the fire out, but, boy, it can sure make things a lot hotter in there.

> [You are] going into a building that [you have] never been in before. You [can] hardly see anything in front of your face and [it is] . . . quite an experience. We have to, [it is] teamwork.

> [We have] . . . to stay with our other guy on the hose line and never leave, never leave out of the building by yourself. [You always have] to stay with your team member.

> If we can get the fire out while [it is] still on the interior, [that is] great. If . . . not, then [we have] . . . to back out before the building collapses on us, get the hose lines set up for an exterior attack and try to keep the fire from spreading to the next building.

> . . . .

> After the fire is out, now [we have] . . . to get all our hose[s] and all our tools and equipment picked up. [We have] . . . to continue overhauling the building. We stay around the building for a while to make sure [there are] no other rekindles that will cause the fire to reignite.

> Once we get all our gear back on the fire truck, we head back to the fire station. [We are] out of service at this time. We [cannot] make any calls. [We have] . . . to get back to the fire house, get hose[s] replaced, get any tools or anything replaced that might have been broken or something.

14

> We have to get ourselves back into service again for another, another roll. Usually, it [does not] take too long before we get another one.

When asked on cross-examination by counsel for the NOFD whether he ever had a cardiac condition while working as a firefighter that he had to report to his supervisors because it affected his ability to work, Mr. Safford responded, "No." Further, when asked on cross-examination whether he had any intention of returning to employment, Mr. Safford responded, "Not at my age." On re-direct, Mr. Safford clarified that he did not consider his retirement to be voluntary though and that after he retired his cardiac events changed and explained how:

> The repetitiveness. They became more frequent and longer [in] duration and harder to get them to stop, harder to get me back into a normal sinus rhythm, twelve, twenty-four, thirty-six hours I was spending in [atrial fibrillation], which was constant, my heart skipping a beat, my heart running about 130 beats a minute, [I am] light headed [sic], dizzy. My breathing [is] rapid, shallow . . . .

> This is, this is what I go through every time I have an [atrial fibrillation] attack and, sometimes I can convert out of it and other times I [was not] able to and I had to go to the hospital to get the heart to convert back to a normal rhythm.

After Mr. Safford finished testifying, the WCJ took the matter under advisement and permitted the parties to submit post-trial memoranda.

### April 11, 2022 Judgment and Reasons for Judgment

The WCJ signed a judgment on April 11, 2022, which stated, in pertinent part:

> The Court listened attentively to the testimony of the witness and carefully observed his demeanor. The Court has considered the entire record in this matter: the pleadings, witnesses and their testimony, the exhibits and the arguments and memorandum of counsel. The Court has concluded from the evidence before it, the following:

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the Court found the testimony of Floyd Safford to be credible.

**IT IS FURTHER ORDERED, ADJUDGED and DECREED** that claimant, Floyd Safford, has satisfied his burden of providing that he has an occupational disease that is covered under the [Firefighter's] Heart and Lung Act and that he is disabled from working as a firefighter or otherwise earning 90% of his pre-injury wages as a result of the illness.

**IT IS FURTHER ORDERED, ADJUDGED and DECREED** that claimant, Floyd Safford, is entitled to supplemental earnings benefits for the time period January 1, 2015[,] until June 15, 2020[,] at $438.00 per week.

Additionally, the WCJ issued reasons for judgment. Therein, as relevant to this appeal, the WCJ cited *Poissenot v. St. Bernard Par. Sheriff's Office*, 2009-2793 (La. 1/9/11), 56 So.3d 170, when stating that "[t]he analysis is a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage." Additionally, the WCJ stated, in pertinent part:

> Dr. Iteld, claimant's treating physician, described in his deposition testimony that many persons who have atrial fibrillation are capable of working with this disease because many can control it. However, Dr. Iteld further stated in his deposition that Floyd Safford's specific symptoms during his attacks of atrial fibrillation make him incapable of safely and effectively performing his duties as a firefighter. Claimant, Floyd Safford, testified in some detail the physical nature of being a firefighter. That in addition to the heavy gear being worn by firefighters, the extreme heat generated by the active fires and the pressure generated by the water hose used by firefighters to control active fires is very strenuous and physical. Further, his trial testimony indicated that firefighters rely on one another during active fire scenes not only for extinguishing the fire but for the safety and well-being of each other during these active fires. Mr. Safford testified that if he were to have an atrial fibrillation episode during an active fire, his job performance would greatly suffer and his co-firefighters['] reliance on him would also suffer. The Court found the testimony of Floyd Safford to be credible.
>
> Both the [second medical opinion], Dr. Lavie, and the IME ordered by the Court, Dr. Kelley, opined that Mr. Safford could still perform his duties as a firefighter with atrial fibrillation. The Court

feels that these physicians only experienced a snapshot of claimant. Additionally, the Court believes that their opinions do not reflect the nuances of the kind of debilitating episodes Floyd Safford suffers from at times of atrial fibrillation attacks and how such episodes would be detrimental in performance as a firefighter during an active fire. Their opinions seem to be based on theoretical clinical evaluations about atrial fibrillation rather than individualized as to Floyd Safford. The Court is aware that the OWC appointed the IME with Dr. Kelley and his opinion is prima facie evidence in this matter. However, the Court has weighed the evidence, testimony and factors as dictated under Daigle and gives more weight to that of his long-time treating physician, Dr. Bruce Iteld, who would be better aware of Floyd Safford's nuances associated with his diagnosis of atrial fibrillation.

The NOFD timely filed a Motion for New Trial on April 19, 2022, regarding the April 11, 2022 judgment.[7] On June 7, 2022, the WCJ signed a judgment that denied the NOFD's Motion for New Trial. On June 8, 2022, the NOFD filed a "Motion for Suspensive Appeal" ("Motion for Appeal"), which stated that the NOFD sought "to take a [s]uspensive [a]ppeal . . . on the final judgment . . . denying [its] Motion for New Trial . . . ." The WCJ granted the NOFD's Motion for Appeal and set the suspensive appeal bond at $100,000. The NOFD timely furnished the appeal bond.

## ASSIGNMENTS OF ERROR

In its brief to this Court, the NOFD asserts four assignments of error. Specifically, it contends:

1. The [WCJ] committed reversible error in reviewing the facts and evidence presented when the Court specifically cited *Poissenot v. St. Bernard Par. Sheriff's Off.*, 2009-2793 (La. 1/9/11[)], 56 So.3d 170, 174, by stating that "the analysis is a facts and circumstances one in

---

[7] Though the WCJ signed the judgment on April 11, 2022, the Notice of Signing of Judgment is dated April 12, 2022. The NOFD filed its Motion for New Trial on April 19, 2022. Louisiana Code of Civil Procedure Article 1974 provides that a party has seven days after the clerk has mailed or the sheriff has served notice of the judgment within which to apply for a new trial. Thus, the NOFD's Motion for New Trial was timely.

which the court is mindful of the jurisprudential tenet that workers' compensation is to liberally construed in favor of coverage."

2. The [WCJ] committed reversible error in finding that the Claimant was disabled under the [Firefighter's] Heart and Lung Act.

3. The [WCJ] committed error in finding that the Claimant was entitled to Supplemental Earnings Benefits from January 1, 2015[,] through June 11, 2020.

4. The [WCJ] committed reversible error in NOT considering that Claimant was retired or voluntarily removed from the workforce after his December 8, 2004 incident.

Prior to discussing the merits of these assignments of error, we must address a preliminary matter.

## PRELIMINARY MATTER – JUDGMENT APPEALED

As previously explained, the NOFD's Motion for Appeal states that the judgment appealed is the June 7, 2022 judgment, which denied the NOFD's Motion for New Trial. Prior to addressing the merits of an appeal, appellate courts have the duty to determine *sua sponte* whether their appellate court jurisdiction has been properly invoked by a valid, final judgment. *Bayer v. Starr Int'l Corp.*, 2017-0257, p. 3 (La. App. 4 Cir. 8/15/17), 226 So.3d 514, 517 (first citing *Moon v. City of New Orleans*, 2015-1092, 1093, p. 5 (La. App. 4 Cir. 3/16/16), 190 So.3d 422, 425; then citing *Tsegaye v. City of New Orleans*, 2015-0676, p. 3 (La. App. 4 Cir. 12/18/15), 183 So.3d 705, 710; and then citing *Delta Staff Leasing, LLC v. S. Coast Solar, LLC*, 2014-1328 (La. App. 4 Cir. 9/23/15), 176 So.3d 668). This Court has held that "a judgment denying a motion for a new trial is a non-appealable interlocutory judgment." *State ex rel. Dep't of Health & Human Res. v. Anderson*, 2004-1567, p. 3 (La. App. 4 Cir. 3/9/05), 899 So.2d 93, 95 (citing La.

18

C.C.P. arts. 1914(C)[8] and 2083[9]). If "it is clear," however "that an appellant intended to appeal a judgment on the merits rather than a judgment denying a motion for a new trial," then the appellate court "will consider the appeal to be an appeal of the judgment on the merits even though the notice of appeal only referred to the judgment denying the new trial." *Id.* (first citing *Smith v. 4938 Prytania St.*, 2004-0833, p. 5 (La. App. 4 Cir. 1/26/05), 895 So.2d 65, 68-69; and then citing *Fruehauf Trailer Co. v. Baillio*, 252 La. 181, 189, 210 So.2d 312, 314-15 (1968)). *See also, e.g., Gniady v. Ochsner Clinic Found.*, 2023-0215 (La. App. 4 Cir. 12/28/23), ___ So.3d ___, 2023 WL 8946265. The appellate court makes this determination by looking at the appellant's brief and assignments of error. *Anderson*, 2004-1567, p. 3, 899 So.2d at 95.

In the matter *sub judice*, although the NOFD's Motion for Appeal states that the judgment appealed is the WCJ's judgment denying the NOFD's Motion for New Trial, the NOFD's brief addresses the merits of the April 11, 2022 judgment, in which the WCJ concluded that Mr. Safford proved a disabling injury under the Firefighters' Heart and Lung Act and was entitled to supplemental earnings benefits. Additionally, as excerpted above, the NOFD's assignments of error relate to the merits of the April 11, 2022 judgment. Accordingly, we will consider the NOFD's appeal to be an appeal of the April 11, 2022 judgment on the merits even though the NOFD only referred to the judgment denying its Motion for New Trial in its Motion for Appeal.

---

[8] Louisiana Code of Civil Procedure Article 1914 is titled "Interlocutory judgments; notice; delay for further action." Section (C) provides that a judgment refusing to grant a new trial is an interlocutory judgment.

[9] Regarding appealable judgments, La. C.C.P. art. 2083(C) provides that "[a]n interlocutory judgment is appealable only when expressly provided by law."

However, "[i]t is well-settled that although an interlocutory judgment may not itself be immediately appealable, it is nevertheless subject to review by an appellate court when a judgment is rendered in the case which is appealable." *Elysian, Inc. v. Neal Auction Co.*, 2020-0674, p. 9 (La. App. 4 Cir. 7/21/21), 325 So.3d 1075, 1083 (first citing *People of the Living God v. Chantilly Corp.*, 251 La. 943, 947-48, 207 So.2d 752, 753 (1968); and then citing *Phillips v. Gibbs*, 2010-0175, p. 4 (La. App. 4 Cir. 5/21/10), 39 So.3d 795, 798). That is, if "an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment." *Id.* (first citing *Wimsatt v. City of New Orleans*, 2019-0461, p. 7, n. 6 (La. App. 4 Cir. 12/20/19), 286 So.3d 1217, 1223; and then citing Roger A. Stetter, LOUISIANA CIVIL APPELLATE PROCEDURE, § 3:36 (Sept. 2020 Update)). *See also Soileau v. Churchill Downs La. Horseracing Co.*, 2021-0022, 0049, 0199, pp. 40-41 (La. App. 4 Cir. 12/22/21), 334 So.3d 901, 928 (citation omitted), *writ denied*, 2022-00243 (La. 04/12/22), 336 So.3d 83. Thus, based on the foregoing jurisprudence, while the WCJ's denial of the NOFD's Motion for New Trial was an interlocutory judgment not subject to appeal, we will nonetheless review it in addition to our review of the final judgment. Next, we turn to the applicable standards of review.

**STANDARDS OF REVIEW**

As previously stated, the NOFD seeks review of the WCJ's June 7, 2022 judgment, which denied the NOFD's Motion for New trial regarding Mr. Safford's underlying workers' compensation claim. Because the NOFD's Motion for New Trial was based on the WCJ's April 11, 2022 judgment, which concluded that Mr. Safford satisfied his burden of proving that he had an occupational disease covered

by the Firefighter's Heart and Lung Act, we will outline the standards of review applicable to motions for new trial, as well as the standard of review in cases brought under the Firefighter's Heart and Lung Act and the Louisiana Workers' Compensation Act.

## MOTION FOR NEW TRIAL

As stated previously, the NOFD appeals the WCJ's June 7, 2022 judgment, which denied the NOFD's Motion for New Trial, and we will consider this judgment as part of the unrestricted appeal of the April 11, 2022 judgment. Louisiana Code of Civil Procedure Article 1972 provides peremptory grounds for granting a motion for new trial. It states:

> A new trial shall be granted, upon contradictory motion of any party, in the following cases:
>
> (1) When the verdict or judgment appears clearly contrary to the law and the evidence.
>
> (2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
>
> (3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.

Further, La. C.C.P. art. 1973 provides discretionary grounds for granting a motion for new trial, stating that "[a] new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law."

As this Court explained in a previous workers' compensation case, "[a] trial judge has broad discretion in the granting or denying of a [m]otion for [n]ew [t]rial." *Celestine v. City of New Orleans*, 2010-0196 (La. App. 4 Cir. 12/22/10), 2010 WL 8972261, at *4-5 (unpub.) (quoting *Jackson v. Bally's La., Inc.*, 2009-1574, p. 4 (La. App. 4 Cir. 4/7/10), 36 So.3d 1001, 1004). Thus, in workers'

21

compensation cases, as in other matters, "[t]he applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion." *Bosworth v. Alpha Mut., L.L.C.*, 2008-0999, p. 7 (La. App. 4 Cir. 2/11/09), 6 So.3d 873, 877 (citing *Campbell v. Tork, Inc.*, 2003-1341, p. 4 (La. 2/20/04), 870 So.2d 968, 971). This standard of review applies to "the denial of a motion for a new trial, whether on peremptory or discretionary grounds . . . ." *Am. Home Assurance Co. v. LA Worker's Comp. Second Inj. Bd. (Landry)*, 2007-2105, p. 8 (La. App. 1 Cir. 5/2/08), 991 So.2d 500, 505 (citing *Drapcho v. Drapcho*, 2005-0003, p. 10 (La. App. 1 Cir. 2/10/06), 928 So.2d 559, 565).

## *FIREFIGHTER'S HEART AND LUNG ACT / WORKERS' COMPENSATION*

Because the NOFD's Motion for New Trial was based on Mr. Safford's underlying workers' compensation claim, which he brought pursuant to the Firefighter's Heart and Lung Act, we must also determine the standard of review applicable to appeals arising under these laws. The Firefighter's Heart and Lung Act is codified at La. R.S. 33:2581, and it provides:

> Any disease or infirmity of the heart or lungs which develops during a period of employment in the classified fire service in the state of Louisiana shall be classified as a disease or infirmity connected with employment. The employee affected, or his [or her] survivors, shall be entitled to all rights and benefits as granted by the laws of the state of Louisiana to which one suffering an occupational disease is entitled as service connected in the line of duty, regardless of whether the fire[fighter] is on duty at the time he [or she] is stricken with the disease or infirmity. Such disease or infirmity shall be presumed, prima facie, to have developed during employment and shall be presumed, prima facie, to have been caused by or to have resulted from the nature of the work performed whenever same is manifested at any time after the first five years of employment.

As this Court has previously explained:

> Even though [the Firefighter's Heart and Lung Act] is not part of the [Workers'] Compensation Act, we have invoked its application to work[ers'] compensation cases. . . . Moreover, the [Firefighter's Heart

and Lung Act] provides, in pertinent part, that the affected fire[fighter] "shall be entitled to all rights and benefits as granted by the laws of the State of Louisiana to which one suffering an occupational disease is entitled as service connected in the line of duty, regardless of whether the fire[fighter] is on duty at the time he [or she] is stricken with the disease . . . ." The [Workers'] Compensation Act is one such Louisiana law conferring benefits on employees stricken with occupational disease.

*Saling v. City of New Orleans*, 398 So.2d 1205, 1207 (La. App. 4th Cir. 1981).

Thus, "[o]nce a disease or condition covered by [the Firefighter's Heart and Lung Act] is found to exist, the applicability of the workers' compensation provisions is resolved and questions attendant to compensation are then decided pursuant to La. R.S. 23:1021 et seq." *Amos v. Ouachita Par. Police Jury*, 43,289, p. 16 (La. App. 2 Cir. 6/18/08), 991 So.2d 102, 111 (first citing *Coats v. City of Bossier City*, 31,164, p. 3 (La. App. 2 Cir. 10/30/98), 720 So.2d 1283, 1286; then citing *City of Jennings v. Deshotel*, 1999-1232, p. 4 (La. App. 3 Cir. 2/2/00), 758 So.2d 269, 271-72; and then citing *Meche v. City of Crowley Fire Dep't*, 1996-577, p. 4 (La. App. 3 Cir. 2/12/97), 688 So.2d 697, 700).

In cases involving the Firefighter's Heart and Lung Act, as in other workers' compensation cases, an appellate court applies the manifest error/clearly wrong standard of review "even when the tribunal's decision is based solely upon written reports, records, or depositions." *Gilliland v. City of Monroe*, 42,458, p. 9 (La. App. 2 Cir. 10/10/07), 968 So.2d 270, 275 (citing *Peters v. Gen. Motors Corp.*, 39,279, p. 4 (La. App. 2 Cir. 1/26/05), 892 So.2d 717, 720). *See also Attaway v. City of Natchitoches*, 1994-813, p. 2 (La. App. 3 Cir. 2/1/95), 651 So.2d 306, 307 (citing *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989)). When applying this standard of review, the appellate court determines whether the trier of fact's conclusion was reasonable, not whether the trier of fact was right or wrong.

*Thibodaux v. Grand Isle Shipyard*, 2016-0583, p. 6 (La. App. 4 Cir. 12/21/16), 207 So.3d 459, 464 (quoting *Hahn v. X-Cel Air Conditioning, Inc.*, 2012-0236, p. 4 (La. App. 4 Cir. 1/9/13), 108 So.3d 262, 266). "If the factfinder's findings are reasonable in light of the record reviewed in its entirety," then the appellate court "may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at p. 6, 207 So.3d at 464-65 (quoting *Baker v. Harrah's*, 2015-0229, p. 6 (La. App. 4 Cir. 3/9/16), 190 So.3d 379, 386). This is because "[w]here there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong." *Hall v. Glob. Sol. Servs., LLC*, 2018-0060, p. 3 (La. App. 4 Cir. 6/20/18), 249 So.3d 895, 897 (citing *Chaisson v. La. Rock Monsters, LLC*, 2013-1423, p. 3 (La. App. 4 Cir. 4/2/14), 140 So.3d 55, 57). If the workers' compensation judges' "findings are based on determinations regarding the credibility of witnesses, the manifest error - clearly wrong standard demands great deference to the trier of fact's findings" because "only the factfinder can be aware of the variations of demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *McDuffie v. State Farm Mut. Auto. Co.*, 2019-344, p. 3 (La. App. 5 Cir. 12/30/19), 287 So.3d 899, 902 (citing *Simmons v. Jackson*, 2018-141, p. 3 (La. App. 5 Cir. 12/19/18), 262 So.3d 995, 998).

However, if "legal error interdicts the fact-finding process in a workers' compensation proceeding," then the appellate court applies the *de novo* standard of review instead. *Thibodaux*, 2016-0583, p. 6, 207 So.3d at 465 (citing *Tulane Univ. Hosp. & Clinic v. Lockheed Martin Corp.*, 2011-0179, p. 3 (La. App. 4 Cir. 6/29/11), 70 So.3d 988, 990). That is, if the appellate court "finds that a reversible

error of law or manifest error of material fact was made in the trial court," then the appellate court must "redetermine the facts *de novo* from the entire record and render a judgment on the merits." *Rosell*, 549 So.2d at 844 n.2 (citations omitted). *See also Latour v. Steamboats, LLC*, 2023-00027, p. 17 (La. 10/20/23), 371 So.3d 1026, 1040-41 (holding that the trial court's erroneous exclusion of evidence meant that "[t]he court of appeal must . . . redetermine the facts [*de novo*] from the entire record . . . and decide the merits of the case"). Similarly, the appellate court applies the *de novo* standard of review in workers' compensation matters if the issue concerns interpretation of statutes because this constitutes "a question of law" for which the appellate court must "determine if the ruling was legally correct." *Thibodaux*, 2016-0583, p. 6, 207 So.3d at 465 (quoting *Tulane Univ. Hosp. & Clinic*, 2011-0179, p. 3, 70 So.3d at 990).

With these standards of review in mind, we turn to the merits of the arguments.

## DISCUSSION

***ASSIGNMENT OF ERROR NUMBER ONE: the WCJ committed reversible error in reviewing the facts and evidence under the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage.***

In its first assignment of error, the NOFD argues that the WCJ "committed reversible error in reviewing the facts and evidence presented when the Court specifically cited *Poissenot v. St. Bernard Par. Sheriff's Off.*, 2009-2793 (La. 1/9/11[)], 56 So.3d 170, 174, by stating that 'the analysis is a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to [be] liberally construed in favor of coverage.'" The NOFD contends that this Court "must assume that the [WCJ] analyzed the facts and evidence and liberally construed them in favor of [Mr. Safford] and coverage."

25

In so doing, the NOFD argues that the WCJ failed to consider La. R.S. 23:1020.1, which the Louisiana Legislature amended in 2012. The NOFD asserts that, because of this error, this Court should either remand this matter to the WCJ with instructions to view the evidence and facts neutrally, or review this matter *de novo* with complete disregard to the WCJ's judgment. In response, Mr. Safford counters that the WCJ's quote from *Poissenot* was "essentially [a] boilerplate statement that adorns innumerable Louisiana worker[s'] compensation decisions, including at least a dozen cases decided since the 2012 change in the law referenced by the [NOFD]."

As the NOFD correctly observes, in *Poissenot,* the Louisiana Supreme Court stated that "[t]he analysis [regarding an employee's entitlement to supplemental earnings benefits] is necessarily a facts and circumstances one in which the court is mindful of the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage." 2009-2793, p. 6, 56 So.3d at 174 (citing *Daigle v. Sherwin-Williams Co.*, 545 So.2d 1005, 1007 (La. 1989)). Additionally, the NOFD correctly points out that in the WCJ's written reasons for judgment, the WCJ repeated that statement from *Poissenot* and cited to *Poissenot*. The NOFD is also correct that after the Louisiana Supreme Court rendered its opinion in *Poissenot*, the Louisiana Legislature amended La. R.S. 23:1020.1. After the amendment, La. R.S. 23:1020.1(D) provides, in pertinent part:

> D. Construction. The Louisiana Workers' Compensation Law shall be construed as follows:
>
> (1) The provisions of this Chapter are based on the mutual renunciation of legal rights and defenses by employers and employees alike; therefore, it is the specific intent of the legislature that workers' compensation cases shall be decided on their merits.

> (2) *Disputes concerning the facts in workers' compensation cases shall not be given a broad, liberal construction in favor of either employees or employers*; the laws pertaining to workers' compensation shall be construed in accordance with the basic principles of statutory construction and not in favor of either employer or employee.

(Emphasis added.) Accordingly, if the disputed issue involves merely questions of fact, then the workers' compensation judge is not to broadly and liberally construe the facts in favor of either the employee or the employer. La. R.S. 23:1020.1(D)(2); *see also Guidry v. Worknet 2000, Inc.*, 2021-0089, pp. 9-10 (La. App. 3 Cir. 8/11/21), 329 So.3d 328, 334 (holding that the employee was wrong in his contention that the workers' compensation judge erred by failing to liberally construe the Workers' Compensation Act because the issue was whether the employee was engaged in horseplay at the time of the accident, which constituted a clear factual dispute.)

Based on the foregoing, the NOFD is correct that the WCJ was not supposed to broadly and liberally construe facts in favor of Mr. Safford. However, apart from the quote from *Poissenot*, in reading the entirety of the WCJ's reasons for judgment, we find that the WCJ did not broadly and liberally construe the facts in favor of Mr. Safford. Rather, the WCJ explained that she found Mr. Safford to be credible and noted his testimony about the effort involved in fighting a fire; his explanation that firefighters must rely on each other while responding to a fire; and his concern about his ability to perform as a firefighter if he were to experience an atrial fibrillation episode during an active fire response. The WCJ also detailed the portions of Dr. Iteld's deposition testimony that factored into her judgment, in particular "that [Mr.] Safford's specific symptoms during his attacks of atrial

27

fibrillation make him incapable of safely and effectively performing his duties as a firefighter."

Further, and contrary to contentions by the NOFD in its brief, the WCJ considered Dr. Lavie's and Dr. Kelley's opinions and specified why she gave more weight to Dr. Iteld's and Mr. Safford's testimony. The WCJ explained that Dr. Lavie and Dr. Kelley "only experienced a snapshot of [Mr. Safford]" and "their opinions do not reflect the nuances of the kind of debilitating episodes [Mr.] Safford suffers from at times of atrial fibrillation attacks and how such episodes would be detrimental in performance as a firefighter during an active fire." Instead, the WCJ found that Dr. Lavie's and Dr. Kelley's "opinions seem to be based on theoretical clinical evaluations about atrial fibrillation rather than individualized as to [Mr.] Safford." Thus, given the totality of the WCJ's reasons for judgment, we disagree with the NOFD that the WCJ committed reversible error by reviewing the facts and evidence under the jurisprudential tenet that workers' compensation is to be liberally construed in favor of coverage.

Moreover, we note that the WCJ provided the outdated *Poissenot* quote in its reasons for judgment, not the judgment itself. "A judgment and reasons for judgment are two separate and distinct documents." *McDuffie*, 2019-344, p. 5, 287 So.3d at 903 (first citing La. C.C.P. art. 1918; and then citing *Dufresne v. Dufresne*, 2010-963, p. 6 (La. App. 5 Cir. 5/10/11), 65 So.3d 749, 754). An appeal is "taken from the trial court's final judgment, not the written reasons for judgment." *Id.* (citing *Knight v. Magri*, 2015-0543, p. 5 (La. App. 5 Cir. 2/24/16), 188 So.3d 311, 314). This is because "[r]easons for judgment" merely "set forth the basis for the court's holding and are not binding." *Id.* (citing *Metairie Carnival Club, Inc. v. Lundgren*, 2012-246, p. 7 (La. App. 5 Cir. 10/20/12), 102 So.3d 999,

1002). As this Court has previously stated, "[i]t is well-established that reasons for judgment are not controlling and do not constitute the judgment of the court." *Theresa Seafood, Inc. v. Berthelot*, 2009-0814, p. 7 (La. App. 4 Cir. 3/10/10), 40 So.3d 132, 137 (citing *Kaufman v. Adrian's Tree Serv., Inc.*, 2000-2381, p. 3 (La. App. 4 Cir. 10/31/01), 800 So.2d 1102, 1104). Therefore, if a "trial court's reasons for judgment are flawed, but the judgment is correct," then "the judgment controls." *McDuffie*, 2019-344, pp. 5-6, 287 So.3d at 903-04 (citing *Dileo v. Horn*, 2015-684, p. 27 (La. App. 5 Cir. 3/16/16), 189 So.3d 1189, 1208). This is because "[a]ppellate courts examine the result of the judgment rather than the reasons." *Dileo*, 2015-684, p. 27, 189 So.3d at 1208 (citing *Dufresne*, 2010-963, p. 6, 65 So.3d at 754). To this end, we note that the WCJ correctly stated in the April 11, 2022 judgment that Mr. Safford bore the burden of proof in this matter. *See Guillory v. State*, 486 So.2d 1195, 1198 (La. App. 3rd Cir. 1986) (finding that a statement in the trial court's reasons for judgment indicated that the trial judge applied the proper standard of proof).

In sum, this assignment of error is without merit. We conclude that there is no reason to remand this matter to the WCJ with instructions to view the evidence and facts neutrally or to review this matter *de novo* with complete disregard to the WCJ's judgment.

**ASSIGNMENT OF ERROR NUMBER TWO: the WCJ erred in finding that Mr. Safford was disabled under the Firefighter's Heart and Lung Act.**

In its second assignment of error, the NOFD asserts that the WCJ "committed reversible error in finding that [Mr. Safford] was disabled under the Heart and Lung Act." The NOFD does not dispute that Mr. Safford was entitled to the presumptions of the Firefighter's Heart and Lung Act that his atrial fibrillation

29

developed during his employment and was caused by the nature of his work. Rather, the NOFD contends that Mr. Safford failed to prove that this was a disabling injury. The NOFD points to the fact that Mr. Safford continued to work for years after first being diagnosed with a heart condition on November 7, 1997, until his wrist injury on December 8, 2004. In support of its argument, the NOFD also contends that Mr. Safford was placed on disability retirement only as a result of his wrist injury, not his cardiac condition. Additionally, the NOFD points to the opinions rendered by Dr. Lavie and Dr. Kelley, which stated that Mr. Safford was not disabled as a result of his atrial fibrillation. In this regard, the NOFD argues that "it appears the Court did not address [Dr. Lavie's opinions, at all, save a brief comment" and that "the [WCJ] appears to have only given its own doctor's report and opinions, Dr. Glenn Kelley, a cursory review." Addressing the NOFD's second assignment of error, Mr. Safford asserts that the WCJ did not err in finding that Mr. Safford was disabled under the Firefighter's Heart and Lung Act and that the WCJ has broad discretion to weigh the evidence and make credibility determinations. Mr. Safford argues that the WCJ found his and Dr. Iteld's testimony compelling and had the discretion to give less weight to the opinion of the IME.

*Disabling Injury*

First, we consider the NOFD's argument that Mr. Safford did not prove a disabling injury, particularly in light of the fact that he worked with atrial fibrillation between 1997 and 2004 and retired because of his hand injury. In interpreting the Firefighter's Heart and Lung Act, this Court has explained that "a five-year veteran employee in the classified fire service is not only entitled to workers' compensation benefits by the Act's treatment of his [or her] heart-related

disease as an occupational disease, but is also entitled to a presumption that such heart-related disease developed during his [or her] employment and was caused by or resulted from the nature of the work performed." *Richards v. St. Bernard Par. Gov't*, 2011-1724, p. 5 (La. App. 4 Cir. 5/2/12), 91 So.3d 524, 528. Under the Firefighter's Heart and Lung Act, even after the "employee has established the existence of an occupational disease," however, "for [the employee's] illness to be compensable, [the employee] must further establish that the illness is disabling." *Amos*, 43,289, p. 16, 991 So.2d at 111 (first citing *Coats v. Am. Tel. & Tel. Co.*, 1995-2670, p. 7 (La. 10/25/96), 681 So.2d 1243, 1247; then citing *Miller v. Roger Miller Sand, Inc.*, 1994-1151, p. 6 (La. 11/30/94), 646 So.2d 330, 334; and then citing *Collins v. Gen. Motors Corp.*, 31,782, p. 3 (La. App. 2d Cir. 03/31/99), 736 So.2d 947, 950-51). The mere fact that an unrelated injury rendered a claimant totally disabled does not negate the fact that an occupational disease may have also left the claimant with some form or degree of disability even if the claimant had been working while afflicted with the occupational disease. *Id.* at p. 16, 991 So.2d at 112.

For example in *Amos*, the claimant suffered a debilitating stroke on November 26, 2002, which rendered him totally disabled, but then doctors subsequently determined that the claimant had also been suffering from lung disease. 43,289, pp. 16-17, 91 So.2d at 111-12. The Louisiana Second Circuit Court of Appeal ("Second Circuit") noted the testimony of two doctors, who stated "that, with [claimant's] current readings from pulmonary function tests, claimant cannot return to his employment as a firefighter." *Id.* at p. 17, 91 So.2d at 112. Additionally, the Second Circuit pointed out that one of the doctors "stated that had he seen claimant prior to [the] stroke, he would have put [claimant] on

disability at that time" because of claimant's lung disease. *Id.* The Second Circuit explained that "the mere fact that the stroke, and not his lung disease, rendered claimant totally disabled [did] not negate the fact that the occupational [lung] disease . . . left [the claimant] with some form or degree of disability." *Id.* at p. 16, 91 So.2d at 112. The Second Circuit concluded that the claimant established that he was partially and permanently disabled solely as a result of his lung disease. *Id.* at p. 17, 91 So.2d at 112.

We find *Amos* similar to the matter *sub judice*, and that, as in *Amos*, the record supports the WCJ's finding that Mr. Safford's atrial fibrillation rendered him disabled from firefighting. In particular, Dr. Iteld testified that, although he never put it in writing, during Mr. Safford's appointments, he specifically told Mr. Safford that he was disabled from being a firefighter. In explaining his opinion, Dr. Iteld provided three specific reasons why Mr. Safford's atrial fibrillation rendered him disabled even though atrial fibrillation might not be a cause of disability for everyone. First, Dr. Iteld explained that while some people can manage their atrial fibrillation, others, such as Mr. Safford, "become crippled when they have episodes [be]cause they [do not] feel well." We also note Mr. Safford's own testimony about the debilitating nature of his atrial fibrillation episodes, wherein he described feeling crushing pain in his chest, dizziness, rapid breathing, and faintness. Second, Dr. Iteld stated that Mr. Safford's atrial fibrillation is a cause of disability because of the combination of the unpredictability of atrial fibrillation and the nature of his work as a firefighter (i.e., the physical nature of the work and the life and death nature of the work). We also point to Mr. Safford's own testimony about the heavy weight of the gear that firefighters must carry, the pressure of the hose pushing against them, the heat they must endure, the difficulty of entering an unknown

building while struggling to see, the necessity of working with one's team member, and the need to quickly get ready to respond to the next call. In this regard, Mr. Safford testified that if he had experienced an episode of atrial fibrillation during a response to a fire, he would have had to leave the scene of the fire and would have been unable to perform his job. Third, Dr. Iteld stated that Mr. Safford's atrial fibrillation is not completely controlled with medicine. Mr. Safford specified that the frequency and duration of his atrial fibrillation episodes increased after his retirement, such that even if he had been otherwise cleared to return to firefighting (i.e., if he no longer had restrictions from his hand injury) his cardiac issue would have prevented him from returning to work similar to the claimant in *Amos*.

Also, like the claimant in *Amos*, the fact that Mr. Safford worked with his cardiac condition before suffering from and retiring due to his hand injury does not negate the fact that his atrial fibrillation is disabling. When Dr. Iteld explained that his opinion might differ if Mr. Safford tolerated his atrial fibrillation episodes, if Mr. Safford did not feel bad during his atrial fibrillation episodes, and if medicine better controlled Mr. Safford's atrial fibrillation episodes, counsel for the NOFD questioned whether that categorization did in in fact apply to Mr. Safford because he had atrial fibrillation and worked full duty for seven years before he retired for an unrelated event. Dr. Iteld disagreed, explaining that Mr. Safford "is very symptomatic when he has a regular episode" and that while Mr. Safford's treatment regime at the time of the deposition had improved his atrial fibrillation episodes (i.e., they were less frequent) Mr. Safford did still experience atrial fibrillation episodes. Further, Dr. Iteld testified that even though Mr. Safford worked as a firefighter with atrial fibrillation between 1997 and 2004, the problem is that "when [Mr. Safford] has an episode, [he is] debilitated." Like the claimant's

33

physicians in *Amos*, Dr. Iteld testified that he would not have cleared Mr. Safford to return to firefighting even though Mr. Safford had previously worked with atrial fibrillation. Additionally, as previously noted, Mr. Safford explained that the frequency and duration of his atrial fibrillation episodes increased after his retirement. Thus, it is of no import that Mr. Safford was able to work with atrial fibrillation between 1997 and 2004 if his condition and doctor's orders subsequently changed.

In light of Dr. Iteld's opinion and Mr. Safford's testimony, we conclude that the WCJ was not manifestly erroneous or clearly wrong in finding that Mr. Safford proved that his atrial fibrillation rendered him disabled under the Firefighter's Heart and Lung Act and prevented him from returning to his work as a firefighter. The WCJ's finding is reasonable in light of the foregoing testimony and jurisprudence.

### *Dr. Lavie's and Dr. Kelley's Opinions*

Though we have already found that Dr. Iteld's and Mr. Safford's testimony supports the WCJ's conclusion, we also address the NOFD's contention that "it appears the [WCJ] did not address [Dr. Lavie's] opinions, at all, save a brief comment" and that "the [WCJ] appears to have only given its own doctor's report and opinions, Dr. Glenn Kelley, a cursory review." Regarding Dr. Kelley's role as an IME, in workers' compensation cases relative to the appointment of an IME, La. R.S. 23:1123 provides:

> If any dispute arises as to the condition of the employee, or the employee's capacity to work, the assistant secretary, upon application of any party, shall order an additional medical opinion regarding an examination of the employee to be made by a medical practitioner selected and appointed by the assistant secretary. The medical examiner shall report his conclusions from the examination to the assistant secretary and to the parties and such report shall be prima

facie evidence of the facts therein stated in any subsequent proceedings under this Chapter.

Thus, according to La. R.S. 23:1123, "if a dispute arises as to the employee's condition, the worker[s'] compensation judge is allowed to order an independent medical examination by an impartial doctor, and the report from such examination shall be 'prima facie' evidence of the facts therein stated in any subsequent proceedings . . . ." *Charles v. Universal Servs., Inc.*, 1999-0689, p. 9 (La. App. 4 Cir. 7/19/00), 773 So.2d 771, 776 (citation omitted).

In interpreting La. R.S. 23:1123, the courts have stated "that an IME's medical conclusions should be given significant weight because the IME is an objective witness." *Bell v. Mid City Printers, Inc.*, 2010-0818, p. 11 (La. App. 4 Cir. 12/22/10), 54 So.3d 1226, 1234 (first citing *Frye v. Olan Mills*, 44,192 p. 6 (La. App. 2 Cir. 4/8/09), 7 So.3d 201, 205; and then citing *Marks v. 84 Lumber Co.*, 2006-0358, p. 7 (La. App. 3 Cir. 9/27/06), 939 So.2d 723, 730). In *Brock v. Morton Goldberg Auction Galleries*, this Court found that the hearing officer in that workers' compensation matter erred in according more weight to the IME's opinion, in part, because the claimant's treating physician saw him on a more regular basis. 631 So.2d 512, 516 (La. App. 4th Cir. 1994). In so finding, this Court held that "[g]enerally speaking the testimony of [a] treating physician is entitled to greater weight than that of a physician who sees the claimant for litigation purposes only." *Id.* (first citing *Dumas v. Hartford Ins.*, Co. 583 So.2d 31, 34 (La. App. 4th Cir. 1991); and then citing *Franklin v. Pizza Hut, Inc.*, 572 So.2d 685, 687 (La. App. 4th Cir. 1990)). Nevertheless, this Court subsequently held that "the treating physician's testimony is not irrebuttable" and that "the opinion of the IME is not conclusive." *Bell*, 2010-0818, pp. 10-11, 54 So.3d at

1234 (citations omitted). Rather, the workers' compensation judge "is required to weigh the testimony of all medical witnesses" and "must evaluate all of the evidence presented in making a decision as to the claimant's condition." *Id.* In determining the weight to give the opinion of an IME, the workers' compensation judge can consider, in pertinent part, that physician's opportunity to observe the patient and any other relevant factors. *Id.* at p. 11, 54 So.3d at 1234 (citing *Green v. La. Coca Cola Bottling Co.*, 477 So.2d 904 (La. App. 4th Cir. 1985)).

We disagree with the NOFD's contention that the WCJ failed to consider Dr. Lavie's and Dr. Kelley's opinions. Rather, in her thorough reasons for judgment, the WCJ evaluated and explained the evidence presented in arriving at her decision that Mr. Safford proved a disabling injury. As outlined in our discussion of assignment of error number one, the WCJ specified why she gave more weight to Dr. Iteld's testimony, explaining that Dr. Lavie and Dr. Kelley "only experienced a snapshot of [Mr. Safford]" and "their opinions do not reflect the nuances of the kind of debilitating episodes [Mr.] Safford suffers from at times of atrial fibrillation attacks and how such episodes would be detrimental in performance as a firefighter during an active fire." The WCJ found that Dr. Lavie's and Dr. Kelley's "opinions seem to be based on theoretical clinical evaluations about atrial fibrillation rather than individualized as to [Mr.] Safford." As jurisprudence dictates, and as evidenced by her reasons for judgment, the WCJ weighed the testimony of all three physicians—Dr. Iteld, Dr. Lavie, and Dr. Kelley—in concluding that Mr. Safford was disabled from firefighting. Though he was the court-appointed IME, the WCJ was allowed to give less weight to Dr. Kelley's opinion in light of the fact that he only saw Mr. Safford once and did not

specifically evaluate what would happen if Mr. Safford suffered an atrial fibrillation episode while responding to a fire like Dr. Iteld did.

In sum, the NOFD's second assignment of error is without merit. The WCJ was not manifestly erroneous or clearly wrong in concluding that Mr. Safford proved a disabling injury under the Firefighter's Heart and Lung Act.

***ASSIGNMENTS OF ERROR NUMBERS THREE AND FOUR: the WCJ erred in concluding that Mr. Safford was entitled to supplemental earnings benefits from January 1, 2015, through June 11, 2020, because the WCJ failed to consider that Mr. Safford was retired or voluntarily removed from the workforce after his December 8, 2004 incident.***

In its third assignment of error, the NOFD asserts that the WCJ "committed error in finding that [Mr. Safford] was entitled to Supplemental Earnings Benefits from January 1, 2015[,] through June 11, 2020." Then, in its fourth assignment of error, the NOFD contends that the WCJ "committed reversible error in NOT considering that [Mr. Safford] was retired or voluntarily removed from the workforce after his December 8, 2004 incident." Though the NOFD listed those as separate assignments of error, in the argument section of its brief, the NOFD combined them in arguing under one heading that "[a]lternatively, if Mr. Safford is disabled, he is not entitled to 520 weeks of supplemental earnings benefits as he was retired or voluntarily withdrawn from the workforce." Countering the NOFD's third and fourth assignments of error, Mr. Safford argues that his retirement was due to disability, not old age or years of service. He points to his testimony that he would have continued working but for his hand injury and his efforts to seek employment after he retired from the NOFD. Because the analysis regarding assignments of error numbers three and four is similar and the NOFD merged them in its brief, this Opinion will also combine these assignments of error.

As previously stated, once it is established that the employee's disease or infirmity is covered by the Firefighter's Heart and Lung Act, the Workers' Compensation Act applies and determines the issue of compensation. Found in the Workers' Compensation Act, La. R.S. 23:1221 pertains, in part, to supplemental earnings benefits. According to La. R.S. 23:1221(3)(a)(i), supplemental earnings benefits are provided "[f]or injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury . . . ." This Court has previously explained that "[t]he purpose of [supplemental earnings benefits] is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident." *Breaux v. City of New Orleans*, 1997-0273, p. 4 (La. App. 4 Cir. 8/27/97), 699 So.2d 482, 485 (quoting *Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 1996-2840, p. 8 (La. 7/1/97), 696 So.2d 551, 556). An injured employee is entitled to supplemental earnings benefits if the injury "results in his inability to earn ninety percent (90%) or more of his average pre-injury wage." *Id.* Regarding the burden of proof, this Court has held that the employee bears the initial burden of proving by a preponderance of the evidence that the injury resulted in his inability to earn that amount. *Id.*

The burden of proof is a shifting one though. That is, if the employee meets his or her burden of proof, thereafter the burden shifts to the employer. *Jackson v. Family Dollar Stores of La., Inc.*, 2017-0712, p. 12 (La. App. 4 Cir. 10/24/18), 258 So.3d 165, 176 (first citing *Doane v. Omni Royal Orleans Hotel*, 2016-0144, pp. 5-6 (La. App. 4 Cir. 10/26/16), 204 So.3d 615, 619; and then citing La. R.S. 23:1221(3)(c)(i)). To defeat the employee's claim for supplemental earnings benefits, the employer must prove, by a preponderance of the evidence, that: "(1) the employee is physically able to perform a certain job; and (2) the job was

offered to the employee or that the job was available to the employee in her or the employer's community or reasonable geographic region." *Id.* at pp. 12-13, 258 So.3d at 176. Instead, "the employer can discharge this burden by establishing: (1) the existence of a suitable job within claimant's physical capabilities; (2) the amount of wages an employee with claimant's experience and training can expect to earn in that job; and (3) an actual position available for the particular job at the time the claimant received notification of the job's existence." *Id.* at p. 13, 258 So.3d at 176.

However, La. R.S. 12:1221(3) also states that supplemental earnings benefits terminate upon retirement. It provides, in pertinent part:

> (d) The right to supplemental earnings benefits pursuant to this Paragraph shall in no event exceed a maximum of five hundred twenty weeks, but shall terminate:
>
> . . . .
>
> (iii) When the employee retires; however, the period during which supplemental earnings benefits may be payable shall not be less than one hundred four weeks.

In discussing "retirement" as it relates to supplemental earnings benefits, this Court has previously explained:

> "Retirement" occurs for purposes of [supplemental earnings benefits] entitlement when the worker either "withdraws from the work force" or draws old age social security benefits, whichever comes first. *Allen v. City of Shreveport*, [19]93-2928 (La. 5/23/94), 637 So.2d 123, 127. Determination of whether an employee has "withdrawn from the work force" for purposes of [supplemental earnings benefits] is based on many factors, including age; the circumstances of each case control. *Mason v. Auto Convoy*, 27,444 (La. App. 2[] Cir. 11/1/95), 662 So.2d 843, 846, *writ denied*, [1995]-2905 (La. 2/2/96), 666 So.2d 1103. Generally, an employee who elects retirement benefits in lieu of returning to work is considered to have retired. *Allen*, 637 So.2d at 127. This rule also applies if the employee states his intention to not look for another job despite his doctor's opinion he could return to sedentary work. *Attaway v. City of Natchitoches*, [19]94-813 (La. App. 3 Cir. 2/1/95), 651 So.2d 306, 308.

On the other hand, unemployment caused solely by employment injury is not considered "retirement" for purposes of terminating [supplemental earnings benefits]. *Margin v. Barthelemy*, [19]93-2224 (La. App. 4 Cir. 5/17/94), 638 So.2d 291, 299, *writ denied*, [19]94-2172 (La. 11/18/94), 646 So.2d 378.

*Breaux*, 1997-0273, pp. 6-7, 699 So.2d at 486.

In interpreting the definition of "retirement" for purposes of supplemental earnings benefits, the Louisiana Third Circuit Court of Appeal ("Third Circuit") recently considered an employer's argument that the claimant failed to show that his work injury resulted in a loss of earning capacity because he withdrew from the workforce for reasons unrelated to his hearing loss or noise-related work restrictions. *Smith v. Packaging Corp. of Am.*, 2022-171, p. 5 (La. App. 3 Cir. 11/30/22), 354 So.3d 132, 136. In finding that the claimant's retirement did not preclude him from subsequently seeking supplemental earnings benefits for his hearing loss, the Third Circuit explained:

when [the doctor subsequently] diagnosed [the claimant] with an occupational disease, found him disabled, and restricted his work . . . [,] the basis for his [supplemental earnings benefits] claim was completed. At that time, [the claimant]'s retirement became one directly affected by his disability, and he was properly treated as a person who left work because of an occupational disease—one who has not retired in the traditional sense. Accordingly, we find [the claimant] presented the [workers' compensation judge] with evidence that he was unable to earn wages because of his occupational hearing loss.

*Id.* at p. 10, 354 So.3d at 139. *See also Bos v. Packaging Corp. of Am.*, 2022-412, pp. 8-9 (La. App. 3 Cir. 2/15/23), 357 So.3d 919, 925.

Similarly, even though when Mr. Safford retired he did not have restrictions regarding his cardiac issue (at the time, his restrictions only related to his hand injury), Dr. Iteld subsequently stated that Mr. Safford's atrial fibrillation rendered him disabled and restricted his ability to be a firefighter. At that time, Mr.

Safford's retirement became affected by his atrial fibrillation, and Mr. Safford was considered to have left work due to his occupational disease, not retirement in the traditional sense. As previously stated, even if Mr. Safford had been otherwise cleared to return to work from his hand injury, his treating physician since 2010, Dr. Iteld, has stated that he would not have cleared Mr. Safford to return to work as a firefighter due to his atrial fibrillation. Thus, we conclude that the WCJ was not manifestly erroneous or clearly wrong in finding that Mr. Safford was entitled to supplemental earnings benefits from January 1, 2015, through June 11, 2020. The NOFD's third and fourth assignments of error are without merit because Mr. Safford was not "retired" for purposes of terminating supplemental earnings benefits as his retirement was affected by his atrial fibrillation upon Dr. Iteld diagnosing Mr. Safford with atrial fibrillation; finding him disabled as a result of his atrial fibrillation; and restricting his work on the basis of his atrial fibrillation.

***Denial of the NOFD's Motion for New Trial***

As previously noted, the NOFD's Motion for Appeal stated that the NOFD sought "to take a [s]uspensive [a]ppeal . . . on the final judgment . . . denying [its] Motion for New Trial . . . ." Though, as we explained, the WCJ's denial of the NOFD's Motion for New Trial was an interlocutory judgment not subject to appeal, we have nonetheless reviewed it as part of the unrestricted appeal of the April 11, 2022 final judgment. After reviewing the record, and for the reasons outlined in the foregoing analysis, there are no peremptory or discretionary grounds warranting a new trial. Therefore, we also conclude that the WCJ did not abuse its discretion in denying the NOFD's Motion for New Trial, and we affirm the WCJ's June 7, 2022 judgment, which denied the NOFD's Motion for New Trial.

### Request for Attorney's Fees on Appeal

In his brief, Mr. Safford requests that this Court award him attorney's fees in connection with this appeal. This Court has held that "'[w]hen the defendant in a workers' compensation case appeals and obtains no relief, and when the appeal has necessitated additional work on the part of plaintiff's counsel, the appellate court usually awards an increase in attorney['s] fees,' *as long as the increase has been properly requested.*" *Aisola v. Beacon Hosp. Mgmt., Inc.*, 2013-1101, p. 17 (La. App. 4 Cir. 4/2/14), 140 So.3d 71, 82 (emphasis added) (first citing *Russell v. Orleans Par. Sch. Bd.*, 2005-1358, p. 9 (La. App. 4 Cir. 5/17/06), 933 So.2d 193, 200; and then citing *McKelvey v. City of Dequincy*, 2007-604, pp. 11-12, (La. App. 3 Cir. 11/14/07), 970 So.2d 682, 690).  Louisiana Code of Civil Procedure Article 2133[10] mandates that an appellee must answer an appeal if the appellee seeks damages against the appellant, including attorney's fees for defense of the appeal. *Brown v. Harmony, L.L.C.*, 2005-0747, p. 5 (La. App. 1 Cir. 3/24/06), 934 So.2d 99, 102; *Deshotel*, 1999-1232, p. 11, 758 So.2d at 275. Thus, the proper method for requesting attorney's fees is by doing so in an answer to the appeal, and "[a]n assertion in a brief cannot serve as an answer to appeal." *Clover v. Redfish Rentals, Inc.*, 2022-470, p. 17 (La. App. 3 Cir. 2/2/23), 357 So.3d 522, 532 (quoting *Pritchard v. GEICO Ins. Co.*, 2017-273, 274, p. 10 (La. App. 3 Cir. 11/8/17), 242 So.3d 787, 794).  If a claimant in a workers' compensation matter "neither answers [the] appeal nor appeals from the [workers' compensation judge's] judgment," then the claimant "is not entitled to additional attorney['s] fees for legal services

_____

[10] Louisiana Code of Civil Procedure Article 2133(A) states, in pertinent part, that "[a]n appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant."

rendered on appeal." *Trejo v. Canaan Constr., LLC*, 52,697, p. 29 (La. App. 2 Cir. 6/26/19), 277 So.3d 499, 517 (citing La. C.C.P art. 2133). In fact, the appellate court is precluded from awarding attorney's fees if the claimant-appellee did not make this request in an answer. *Olivier v. After Crash, Inc.*, 2004-1655, p. 4 (La. App. 3 Cir. 5/4/05), 901 So.2d 1214, 1216-17. This is true even when "there is no doubt that [the c]laimant has incurred more costs in successfully defending his award from the [workers' compensation judge's] judgment, and an award of attorney's fees for work done on appeal may be proper." *Clover*, 2022-470, p. 17, 357 So.3d at 532.

Mr. Safford requested additional attorney's fees associated with this appeal only in his appellate brief. He did not correctly request them by filing an answer to this appeal. La. C.C.P. art. 2133. Although Mr. Safford likely incurred more costs in successfully defending this appeal and an award for work done on this appeal may be proper, we are constrained by La. C.C.P. art. 2133 and the foregoing jurisprudence. Accordingly, we cannot award attorney's fees to Mr. Safford in connection with this appeal, and his request for same is denied.

**DECREE**

For the foregoing reasons, we affirm the WCJ's April 11, 2022 judgment, which held that Mr. Safford satisfied his burden of proving that he had an occupational disease covered by the Firefighter's Heart and Lung Act (La. R.S. 33:2581) and that he was disabled from working as a firefighter or otherwise earning 90% of his pre-injury wages as a result of his illness. Further, we conclude that the WCJ did not abuse its discretion in denying the NOFD's Motion for New Trial. We also deny Mr. Safford's request for attorney's fees associated with this appeal.

**AFFIRMED**